**HOOSIER ENERGY RURAL ELECTRIC COOPERATIVE, INC., Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 53T05–8709–TA–00041.

Tax Court of Indiana.

Sept. 29, 1988.

J. David Huber, Zoercher, Huber & McEntarfer, Tell City, for petitioner.

Linley E. Pearson, Atty. Gen. by Joel Schiff, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

Hoosier Energy Electric Cooperative appeals the final determination of the Indiana Department of State Revenue. Hoosier protested the Department's assessment of gross income tax on the sale-lease back of property. The Department partially sustained the protest, but assessed gross income tax on the sale of federal income tax benefits. Hoosier's protest and subsequent claim for refund of the second assessment was denied by the Department.

Hoosier was an Indiana corporation. It owned and operated the Merom Generating Station, a coal-fired electric generating facility in Sullivan County, Indiana. In 1982, Hoosier sold its rights to claim certain federal income tax benefits to Amoco Tax Leasing IV Corporation, a Delaware corporation with its principal office in Illinois, and J.C. Penney Company, a Delaware corporation with its principal office in New York. The tax benefits consisted of accelerated cost recovery deductions and investment tax credits relating to personal property located at the Merom Generating Station.

The transaction was structured as a sale-lease back of property, whereby Hoosier sold its property to Amoco and Penney, then leased the property back. Unlike a traditional sale-lease back, however, title was never transferred to Amoco and Penney. Title remained at all times in Hoosier. The parties negotiated the value of the tax benefits, to be paid up front in cash. The difference between Hoosier's tax basis in the property and the value of the tax benefits was represented by notes from Amoco and Penney.

Amoco and Penney then leased the property to Hoosier. The amount of rental due on the lease was equal to the amount of principal and interest on the notes. At the end of the lease, Hoosier had the option to buy the property for a nominal amount. The effect of the transaction was thus a complete wash, save the transfer of tax benefits. Congress recognized the transaction as a safe harbor lease under section 201(a) of the Economic Recovery Tax Act (1981), I.R.C. § 168(f), to allow the transfer of tax benefits for the purpose of encouraging capital investment.

Hoosier was audited by the Department for the tax years 1980 through 1983. The Department assessed gross income taxes

of $9,443,457 on Hoosier's 1982 "sale" of personal property to Amoco and Penney. Hoosier protested the assessment.

Prior to its hearing, Hoosier's representative contacted the Department by letter. The letter explained that the safe harbor lease did not constitute a sale of property because no transfer of title had occurred, that the parties merely transferred tax benefits, and that the sale of tax benefits was an interstate transaction exempt from state taxation under the commerce clause. Hoosier reiterated its position at the hearing.

The Department's hearing officer agreed that the safe harbor lease did not constitute a sale of property subject to the gross income tax, but he found that the proceeds from the sale of tax benefits were subject to the gross income tax. The Department issued both a letter of findings and a new assessment for $2,035,406 of gross income tax on the sale of tax benefits represented by the up front money paid by Amoco and Penney. Hoosier paid the tax in full. The Department denied Hoosier's claim for refund. This appeal followed.

The issues presented are:

(1) Whether collection is barred by the statute of limitations; and

(2) Whether the interstate sale of tax benefits under an I.R.C. § 168(f) safe harbor lease is exempt from taxation under the commerce clause.

## I. STATUTE OF LIMITATIONS

Hoosier Energy claims the collection of tax is barred by the statute of limitations because the second assessment, issued March 18, 1987, was not issued within three years of the date the return was filed, as required by IC 6–8.1–5–2(a). The Department claims that the second assessment is a reduction of the original timely assessment, therefore collection is not barred by IC 6–8.1–5–2.

The Department also contends that Hoosier has waived the issue by its failure to raise it in its claim for refund. Hoosier responds that the Department cannot argue waiver because of its failure to plead waiver in its answer.

■ Hoosier is correct in asserting that the Department's responsive pleading should have included waiver. Ind. Rules of Procedure, Trial Rule 8(C). Notwithstanding Trial Rule 8(C), the Department's contention is meritless because original tax appeals involving a claim for refund are *de novo* proceedings. IC 6–8.1–9–1(d) (Supp. 1986). The court's scope of review extends beyond issues argued at the administrative level; questions regarding the statute of limitations are no exception.

■ Hoosier's characterization of the second assessment as one completely unrelated to the original is not persuasive. The "sales price" of the property was $632,153,389. Amoco and Penney paid part of the sales price in cash, amounting to $196,318,566, and the remainder in notes. The amount of the notes equaled the amount of the rental due on the lease when Hoosier "leased back" its own property. The up front money represented the amount the parties negotiated as the value of the tax benefits, constituting the substance of the transaction.

When the Department finally looked to substance over form, it found that only the up front money, or the proceeds from the sale of tax benefits, was subject to tax. In this sense, the second assessment was merely a reduction of the original. Collection is therefore not barred by the statute of limitations.

## II. COMMERCE CLAUSE

Hoosier claims that the sale of tax benefits is an interstate transaction exempt from state taxation under the commerce clause. It argues that the tax falls squarely within the facts of *Freeman v. Hewit* (1946), 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265, and *Indiana Department of State Revenue v. Nebeker* (1953), 233 Ind. 58, 116 N.E.2d 104, *aff'd* (1955), 348 U.S. 933, 75 S.Ct. 354, 99 L.Ed. 731. The Department acknowledges that the sale is an interstate transaction, but argues that the gross receipts from the sale are subject to state taxation under *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326.

Hoosier argues *Freeman* is controlling because it has not been overruled and the sale of tax benefits is indistinguishable from the sale of stock in *Freeman*, therefore this court is required to invalidate the tax. The Department argues that *Complete Auto* is controlling because the Supreme Court has rejected the reasoning of *Freeman*. Hoosier responds that even if the underpinnings of *Freeman* were overruled in *Complete Auto*, the result must be the same as it was in *Freeman* because the *Complete Auto* court adopted the reasoning of Justice Rutledge's concurring opinion in *Freeman*.

Prior to World War II, the Supreme Court's taxation decisions under the commerce clause provided interstate businesses with virtual immunity from state and local taxes. Many state taxes were considered "direct burdens" on interstate commerce and were thus considered impermissible under the commerce clause.

The Supreme Court sharply changed its course with the introduction of the multiple tax doctrine in *Western Live Stock v. Bureau of Revenue* (1938), 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823. Under the multiple tax doctrine, interstate businesses were required to pay their share of the state tax burden, but the commerce clause protected them from cumulative tax burdens not borne by local businesses. *Id.* at 258, 58 S.Ct. at 550. *Freeman v. Hewit* represented the Supreme Court's temporary reversion to the direct burden analysis. *See* J. HELLERSTEIN, STATE TAXATION: CORPORATE INCOME & FRANCHISE TAXES ¶¶ 4.5–4.8 (1983); Hellerstein, W., *State Taxation of Interstate Business: Perspectives on Two Centuries of Constitutional Adjudication*, 41 TAX LAW. 37, 38–50 (1987).

In *Freeman*, the taxpayer was the trustee of an estate created by a will of a decedent domiciled in Indiana at the time of death. The trustee sold securities held by the estate through an Indiana broker, who arranged for the sale of securities on the New York Stock Exchange by New York brokers. Indiana imposed a tax on the gross receipts of the sale.

Justice Frankfurter, writing for the majority, began his analysis of the commerce clause issue: "Our starting point is clear. [T]he Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the states, but *by its own force created an area of trade free from interference by the States.*" *Freeman*, 329 U.S. at 252, 67 S.Ct. at 276 (emphasis added) The Court rejected Indiana's arguments that the tax was valid because it neither discriminated against interstate commerce nor subjected the taxpayer to multiple taxation. The Court concluded that the tax constituted a direct burden on interstate commerce and as such, constituted impermissible interference with the freedom of interstate commerce. *Id.* at 257, 67 S.Ct. at 279.

Justice Rutledge concurred in the result, but declined to join the majority because they disregarded apportionment and the risk of multiple taxation. *Id.* at 260, 67 S.Ct. at 280 (Rutledge, J., concurring). He believed that Indiana had sufficient contacts with the taxpayer to justify the tax under the due process clause, *id.* at 271 n. 27, 67 S.Ct. at 287 n. 27, but that the tax was nevertheless invalid because the taxpayer was subject to the risk of multiple taxation since New York had "equally close and important" connections to the taxpayer. *Id.* at 272, 67 S.Ct. at 287.

In *Nebeker*, the Indiana Supreme Court addressed the question of whether an Indiana owner's sale of securities on margin through nonresident brokers constituted an interstate transaction exempt from taxation under the commerce clause. The court found that the only factual difference between *Nebeker* and *Freeman* was that the stock in *Nebeker* was sold on margin; therefore, *Freeman* was controlling and the tax was invalidated. *Nebeker*, 116 N.E. 2d at 104. *Nebeker* was later affirmed by the Supreme Court on the authority of *Freeman*. *Indiana Dep't of State Revenue v. Nebeker* (1955), 348 U.S. 933, 75 S.Ct. 354, 99 L.Ed. 731.

The Supreme Court continued to adhere to the multiple tax doctrine, but not with-

out occasional reversion to the direct burden analysis revived in *Freeman*. In 1959, the Court observed that its collection of state tax cases left "much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." *Northwestern States Portland Cement Co. v. Minnesota* (1959), 358 U.S. 450, 457, 79 S.Ct. 357, 362, 3 L.Ed.2d 421. Accordingly, the Court put the direct burden analysis forever to rest when it held that a state could impose a fairly apportioned, nondiscriminatory tax on the net income of an out-of-state business engaged exclusively in interstate commerce. *Id.* at 464, 79 S.Ct. at 365. In so doing, the Court was compelled to distinguish *Spector Motor Service, Inc. v. O'Connor* (1951), 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573, because in *Spector*, the Court had invalidated a net income tax virtually identical to the one at issue in *Northwestern*. *Spector*, in turn, had relied on the reasoning of *Freeman v. Hewit*. The Court characterized the tax at issue in *Northwestern* as one on net income, while the tax at issue in *Spector* was characterized as one on the privilege of doing business. *Northwestern*, 358 U.S. at 463–64, 79 S.Ct. at 365. The only practical difference between the two were the words used by legislatures in the tax statutes.

In *Complete Auto Transit v. Brady*, the Supreme Court reconsidered *Spector*. In beginning its analysis of *Spector*, the Court reexamined *Freeman v. Hewit*, observing that in that case "a direct tax on interstate sales, even if fairly apportioned and nondiscriminatory, was held to be unconstitutional *per se*." *Complete Auto*, 430 U.S. at 280, 97 S.Ct. at 1080.

Summarizing *Freeman*, the Court pointed out that the decision had been viewed as "a triumph of formalism over substance." *Id.* at 281, 97 S.Ct. at 1080 (citing P. HARTMAN, STATE TAXATION OF INTERSTATE COMMERCE 200–04 (1953); Dunham, *Gross Receipts Taxes on Interstate Transactions*, 47 COLUM.L.REV. 211 (1947)). Although *Freeman* might have been "the keystone of a movement toward absolute immunity of interstate commerce from state taxation," the Court concluded that the vitality of *Freeman* had been sapped by subsequent decisions narrowing its rule to one of "draftsmanship and phraseology." *Complete Auto*, 430 U.S. at 281, 97 S.Ct. at 1080. *Spector* was deemed an aberration and was overruled. *Id.* at 289, 97 S.Ct. at 1084.

The Court noted Justice Rutledge's concurring opinion from *Freeman* with approval, but did not adopt it verbatim. Instead, the Court fashioned a similar test to examine the constitutionality of state taxes under the commerce clause: the tax must be sufficiently connected to the taxing state to justify the tax; it must be fairly related to benefits provided the taxpayer; it must not discriminate against interstate commerce, and; it must be fairly apportioned. *Id.* at 287, 97 S.Ct. at 1083.

An argument similar to Hoosier's was offered by Washington stevedores challenging the imposition of a business and occupation tax on the gross receipts from stevedoring activities. Relying on *Puget Sound Stevedoring Co. v. State Tax Commission* (1937), 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68, and *Joseph v. Carter & Weekes Stevedoring Co.* (1947), 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993, the stevedores were successful in persuading the Washington Supreme Court to strike down the tax. The United States Supreme Court reversed, holding that *Puget Sound* and *Carter & Weekes* were overruled to the extent that the reasoning therein was contrary to *Complete Auto*. *Department of Revenue v. Association of Washington Stevedoring Cos.* (1978), 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682. The Court also observed:

> That the holding in *Spector* parallels that in *Puget Sound* is demonstrated by the authorities relied upon or provided by both cases in the past. *Spector* relied on *Carter & Weekes*, which reaffirmed *Puget Sound*, and upon *Freeman v. Hewit*. *Freeman*, in turn, relied upon *Puget Sound* and *Carter & Weekes* relied upon *Freeman*. Both *Freeman* and *Puget Sound* relied upon *Galveston H. & S.A.R. Co. v. Texas*, 210 U.S. 217, 28 S.Ct. 638, 52 L.Ed. 1031 (1908).

*Id.* at 746 n. 15, 98 S.Ct. at 1397 n. 15 (citations omitted).

The underpinnings of *Freeman* are also compromised by *Complete Auto.* The tax in this case must be analyzed within the framework articulated by the Court in *Complete Auto.*

Hoosier is an Indiana corporation. The tax benefits relate to property located in Indiana. Hoosier sold its tax benefits to Amoco, a Delaware corporation with its principal office in Illinois, and Penney, a Delaware corporation with its principal office in New York. The sale was facilitated by New York investment bankers. All negotiations were held in New York. The up front money paid by Amoco and Penney was transferred to Hoosier's New York banks.

A substantial nexus exists between Hoosier, the taxpayer, and Indiana, the taxing state. Hoosier is an Indiana corporation. The tax benefits are rooted in Hoosier's personal property, also located in Indiana. As Justice Rehnquist concluded in *D.H. Holmes Co. v. McNamara* (1988), — U.S. —, 108 S.Ct. 1619, 1624, 100 L.Ed.2d 21, "[t]here is 'nexus' aplenty here."

The tax is fairly related to the services provided by Indiana. Hoosier enjoys a wide variety of benefits, such as police and fire protection. *See, e.g., Commonwealth Edison Co. v. Montana* (1981), 453 U.S. 609, 623–24, 101 S.Ct. 2946, 2956–57, 69 L.Ed.2d 884.

The tax does not discriminate against interstate commerce. Nothing in the operation of the tax suggests that out-of-state business bears a greater burden of the tax than local business. *See, e.g., American Trucking Associations, Inc. v. Scheiner* (1987), — U.S. —, 107 S.Ct. 2829, 2840–41, 97 L.Ed.2d 226.

The parties dispute whether the tax is fairly apportioned. Hoosier contends that the tax is flawed because it is unapportioned, thus subjecting the transaction to the risk of multiple taxation. The Department contends that the tax is fairly apportioned because no other state has jurisdiction to tax Hoosier on the gross receipts from the sale of an intangible with a business situs in Indiana.

Under 45 IAC 1–1–51, gross income from the sale of an intangible is subject to the Indiana gross income tax if the intangible has a "business situs" in Indiana. "If the intangible or income derived therefrom forms an integral part of a business regularly conducted at a situs in Indiana," then the taxpayer has a business situs in Indiana and the gross receipts from the sale of such intangibles are taxable in Indiana. 45 IAC 1–1–51. If "the majority of all the taxpayer's activities or business" are located in Indiana, then the taxpayer has a "commercial domicile" in Indiana and all income from the sale of intangibles is taxable in Indiana, except for an intangible with a business situs outside Indiana. *Id.* Hoosier's only commercial domicile is in Indiana. The business situs of the intangible is in Indiana, since the tax benefits relate to personal property owned and operated by Hoosier in Indiana.

Hoosier has the burden of demonstrating the risk of multiple taxation. *Standard Pressed Steel Co. v. Washington Dep't of Revenue* (1975), 419 U.S. 560, 563, 95 S.Ct. 706, 709, 42 L.Ed.2d 719. Actual multiple taxation has not been shown, so Hoosier has the burden of demonstrating that Indiana's taxation scheme poses a risk of multiple taxation in a constitutional sense. *See Exxon Corp. v. Wisconsin Dep't of Revenue* (1980), 447 U.S. 207, 229–30, 100 S.Ct. 2109, 2123–24, 65 L.Ed.2d 66.

Hoosier points to the negotiations, closing, and transfer of funds in New York as local incidents giving New York power to tax the same transaction. The consummation of a transaction within the borders of the taxing state has been held to give the taxing state power to tax. *International Harvester Co. v. Department of Treasury* (1944), 322 U.S. 340, 64 S.Ct. 1019, 88 L.Ed. 1313.

Assuming the activities occurring in New York are sufficient to satisfy the due process clause, Hoosier has not persuaded the court that a New York tax on Hoosier's gross receipts from the sale of an intangible with a business situs in Indiana would

be fairly related to services provided by New York. These contacts might be sufficient to require Hoosier to collect sales tax from its customers if any such sales tax existed, but such phantom obligations do not render unconstitutional Indiana's attempt to tax Hoosier's gross income.

The court recognizes that the specific allocation of all income to a single situs is not a preferred division-of-income method. *See Mobil Oil Corp. v. Commissioner of Taxes of Vermont* (1980), 445 U.S. 425, 444–46, 100 S.Ct. 1223, 1235–36, 63 L.Ed.2d 510; *Exxon Corp. v. Wisconsin Dep't of Revenue* (1980), 447 U.S. 207, 227–29, 100 S.Ct. 2109, 2122–23, 65 L.Ed.2d 66. In *Mobil,* the taxpayer claimed it was subject to the risk of multiple taxation because Vermont sought to tax its share of the taxpayer's dividend income, all of which was supposedly subject to taxation by the state of Mobil's commercial domicile. The Court found that no such risk existed because the taxpayer's state of commercial domicile had, at best, the right to tax only a portion of the taxpayer's dividend income. *Mobil,* 445 U.S. at 445, 100 S.Ct. at 1235.

In *Exxon,* the taxpayer claimed it was subject to the risk of multiple taxation because Wisconsin sought to tax its share of the taxpayer's production income from oil and gas, all of which was hypothetically subject to taxation in the state of actual production. The Court found that no such risk existed because the state of production had no exclusive right to tax the production income of a unitary business. *Exxon,* 447 U.S. at 229, 100 S.Ct. at 2123.

In both *Mobil* and *Exxon,* the Court found that a fictionalized situs for intangible property was not a useful division-of-income method in the taxation of the net income of a unitary business because the taxpayer's activities with respect to the intangible property involved relations with more than one jurisdiction. *Mobil,* 445 U.S. at 445, 100 S.Ct. at 1235; *Exxon,* 447 U.S. at 229–30, 100 S.Ct. at 2123–24. Hoosier has not demonstrated that its activities with respect to the intangible property at issue in this case involve significant relations with New York. Hoosier is not a unitary business. In this case, Indiana does not seek to tax the net income of a unitary business, but rather seeks to tax the gross income from a single transaction involving intangible property with strong connections to Indiana. The court is not persuaded that New York presents a real risk of taxation in a constitutional sense.

Hoosier also contends that 45 IAC 1–1–51 is inapplicable because the regulation also states that certain transactions in intangibles are excluded from taxation, such as "sales which are totally nontaxable as transactions in interstate commerce." Hoosier apparently reads this part of the regulation literally so that all interstate transactions in intangibles are wholly nontaxable. Such a reading echoes Justice Frankfurter's free trade view of the commerce clause, *see Freeman,* 329 U.S. at 252, 67 S.Ct. at 276; this approach has long since been repudiated. The transaction is not "totally nontaxable" because, under *Complete Auto,* the income is subject to Indiana tax so long as the tax passes constitutional muster.

Hoosier also contends that 45 IAC 1–1–119 is an equally valid regulation covering this transaction. In 45 IAC 1–1–119, the taxability of various interstate sales of goods to out-of-state buyers is indicated. The regulation provides the following transaction is nontaxable:

> Sales of stock to nonresidents made through Indiana or nonresident brokers. See *Freeman v. Hewit,* 329 U.S. 249 [67 S.Ct. 274, 91 L.Ed. 265] (1946); also margin transactions and dealings in commodities futures carried on through securities exchanges in other states. See *Indiana Dep't of State Rev., Gross Income Tax Div. v. Nebeker,* 233 Ind. 58, 116 N.E.2d 104 (1953).

45 IAC 1–1–119(1)(e).

The court recognizes that properly promulgated regulations of the Department have the force and effect of law, but cannot construe a regulation grounded in case law which the court has previously found to be of doubtful validity beyond its express terms. The court declines to extend the application of 45 IAC 1–1–119 to the sale of

an intangible other than stock because 45 IAC 1–1–51 adequately covers the subject.

In conclusion, the court finds that the Department's collection of tax is not barred by the statute of limitations because the second assessment was a reduction of the original timely assessment. The court also finds that the result in this case is not controlled by *Freeman* and *Nebeker* because the reasoning underlying those cases has been called into doubt by *Complete Auto*. The court finds that the tax passes constitutional muster under the test articulated in *Complete Auto* since the tax is fairly related to services provided by Indiana, is supported by nexus between Hoosier and Indiana, does not discriminate against interstate commerce, and is fairly apportioned. With regard to the last factor, the court finds that the tax is fairly apportioned because Indiana is the only state empowered to tax the gross receipts from an Indiana corporation's sale of intangible property with an Indiana business situs to out-of-state buyers.

Accordingly, it is therefore ORDERED, ADJUDGED and DECREED that the Department's denial of Hoosier's claim for refund is affirmed. Judgment entered for the Department.