**BETHLEHEM STEEL CORPORATION,**
Petitioner,

v.

**INDIANA DEPARTMENT OF STATE
REVENUE, Respondent.**

No. 49T05–8912–TA–00070.

Tax Court of Indiana.

Aug. 19, 1992.

Michael J. Rusnak, Glenn M. Sermersheim, Locke Reynolds Boyd & Weisell, Indianapolis, for petitioner.

Linley E. Pearson, Atty. Gen., Joel Schiff, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

Bethlehem Steel Corporation (Bethlehem) claims a refund from the Indiana Department of State Revenue (the Department) of gross income tax assessed and collected together with interest on cash proceeds received from interstate transactions structured pursuant to Internal Revenue Code § 168(f)(8) (1981) (repealed 1986) in the amount of $717,451 for the years 1981, 1982, and 1983. The case is before the court on the parties' cross motions for summary judgment.

## FACTS

The parties stipulated the following facts. Bethlehem is a Delaware corporation, commercially domiciled in Bethlehem, Pennsylvania. In 1981, 1982, and 1983, Bethlehem sold its rights to intangible federal income tax benefits, such as investment tax credits, energy tax credits, and accelerated depreciation deductions, to out-of-state purchasers for a cash payment. The tax benefits were based upon and arose out of Bethlehem's purchase and ownership of certain capital equipment located at various plants throughout the nation. Forty-five percent (45%) of the equipment associated with the transferred tax benefits was located at Bethlehem's steel-making facility in Porter County, Indiana, known as the Burns Harbor Plant.

Bethlehem structured the sales of tax benefits pursuant to I.R.C. § 168(f)(8) (the safe harbor leases) [1] as sale-leasebacks: (1) acquiring equipment directly with its own and/or borrowed funds, (2) "selling" the equipment to a "purchaser" in exchange for up-front cash and non-recourse notes totalling Bethlehem's cost basis in the equipment, (3) "leasing" the equipment back for rental payments that exactly equalled, in timing and amount, the principal and interest payments due under the non-recourse notes, and (4) "repurchasing," at its option, the equipment upon the expiration of the lease for a nominal sum.

Although Bethlehem's transactions appeared in form to be sale-leaseback transactions in which the equipment itself was sold and then leased back from the purchasers, the sale-leaseback was actually a legal fiction. Unlike a true sale-leaseback, the equipment was never "sold" or "leased," the title at all times remaining with Bethlehem. The "lease" payments, which completely offset the payments due under the non-recourse notes, were never exchanged. The only cash that actually changed hands was the up-front cash payment to Bethlehem, and the "purchasers" in return were entitled to federal tax benefits as the "owner" of new capital equipment under the federal safe harbor lease provisions.

Bethlehem's decision to enter safe harbor lease transactions was based on financial and investment considerations alone, as the result of advice from investment advisors and legal counsel located outside Indiana. The management at the Burns Harbor Plant had no say in decisions to enter the safe harbor leases, and the business operations at the plant did not influence such decisions. Moreover, the safe harbor lease transactions did not affect the regularly conducted business operations at the Burns Harbor Plant.

---

1. During the years at issue, federal tax benefits associated with the purchase of new equipment were available to offset the taxable income of profitable companies. Loss companies, those without taxable income, were unable, however, to currently use additional tax deductions and credits and, for that reason, would delay new purchases. The safe harbor lease provisions, enacted as part of the Economic Recovery Tax Act in 1981, permitted the sale of generally nontransferable tax benefits to encourage loss companies to invest in new property, thereby modernizing their equipment and improving the gross national product.

Bethlehem sold the tax benefits to non-resident corporations, conducting all negotiations and closings outside the state of Indiana. As a result, Bethlehem received cash proceeds in the amount of $3,207,175 in 1981, $12,999,649 in 1982, and $38,858,543 in 1983.

Bethlehem timely filed its Indiana Corporation Income Tax returns, Form IT–20CY, for the years at issue. After an audit, the Department proposed the assessment of additional gross income tax on the cash proceeds received in 1981, 1982, and 1983, from the sale of federal tax benefits. After a protest hearing, the Department issued its letter of findings and notices of tax due, demanding additional gross income tax and the interest thereon. On June 23, 1988, Bethlehem paid the Department, discharging in full its additional tax and interest liability for the years at issue.

On December 5, 1988, Bethlehem timely filed claims for refund of tax paid and interest accrued from the date of payment for the years 1981, 1982, and 1983. The Department has not to this date made a determination concerning Bethlehem's claims for refund.[2]

## ISSUES

I. Are the cash proceeds received from a safe harbor lease transaction pursuant to Internal Revenue Code § 168(f)(8) "gross income" within the meaning of IND.CODE 6–2.1–1–13?

II. Are the cash proceeds of a non-resident received from a safe harbor lease transaction associated with equipment located in Indiana derived from "sources within Indiana" taxable under IND. CODE 6–2.1–2–2(a)(2)?

III. Whether assessing gross income tax on a non-resident's income derived from the sale of intangible federal tax benefits associated with equipment located in Indiana violates IND.CODE 6–2.1–3–3 and the Commerce Clause of the United States Constitution, article I, sec-

tion 8, clause 3, as income derived from interstate commerce?

## STANDARD OF REVIEW

The court shall grant a motion for summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Ind.Rules of Procedure, Trial Rule 56(C).

Cross motions for summary judgment do not alter the standard for granting summary judgment. *Aetna Ins. Co. v. Rodriguez* (1986), Ind.App., 496 N.E.2d 1321, 1323; Ind.Rules of Procedure, Trial Rule 56(C). Each motion must be considered separately to determine whether there is a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Aetna*, 496 N.E.2d at 1323 (citing *Ebert v. Grain Dealers Mut. Ins. Co.* (1973), 158 Ind.App. 379, 303 N.E.2d 693).

*Caylor–Nickel Clinic, P.C. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 569 N.E.2d 765, 766–67, *aff'd sub nom.*, (1992), Ind., 587 N.E.2d 1311.

"Absent a genuine issue of material fact, the court may grant summary judgment only if one of the parties is entitled to judgment as a matter of law." *Scott Oil Co. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 584 N.E.2d 1127, 1130.

The parties agree this case presents no genuine issue of material fact. The dispute therefore concerns whether, as a matter of law, Indiana can tax Bethlehem Steel's cash proceeds from the interstate sale, pursuant to I.R.C. § 168(f)(8), of its intangible federal income tax benefits related to its equipment located at its Indiana plant.

## DISCUSSION & DECISION

### I.

In this opinion, as well as the two others decided today,[3] the court analyzes limita-

---

**2.** The court has jurisdiction pursuant to IND. CODE 6–8.1–9–1(c)(3).

**3.** *Indiana–Kentucky Elec. Corp. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 598 N.E.2d

647; *First National Leasing and Financial Corp. v. Indiana Department of State Revenue* (1992), Ind.Tax, 598 N.E.2d 640.

tions on state taxation under the Commerce Clause, article I, section 8, clause 3 of the United States Constitution. Indiana imposes gross income tax on the receipt of:

(1) the entire taxable gross income of a taxpayer who is a resident or a domiciliary of Indiana; and

(2) the taxable gross income *derived from activities or businesses or any other sources within Indiana* by a taxpayer who is not a resident or a domiciliary of Indiana.

IC 6–2.1–2–2(a) (emphasis added). Accordingly, the state has the power to tax "gross income" received that is "taxable gross income." " 'Taxable gross income' means the remainder of: (1) all gross income which is not exempt from tax under IC 6–2.1–3; less (2) all deductions which are allowed under IC 6–2.1–4." IC 6–2.1–1–13. The taxability of an Indiana resident therefore requires a two-part analysis: (1) are the receipts "gross income" and (2) is the "gross income" "taxable gross income"? The taxability of a non-resident taxpayer, such as Bethlehem, requires an additional step: (1) are the receipts "gross income," (2) is the "gross income" derived from "sources within Indiana," and (3) is the "gross income" that is derived from "sources within Indiana" "taxable gross income"?

The court notes that the parties argue at length over issues involving the interstate commerce exemption under IC 6–2.1–3–3 and the Commerce Clause, which would ultimately determine whether the receipts are "taxable gross income." The court nonetheless agrees with Judge Sullivan of the Indiana Court of Appeals that

[t]he temptation to consider the Indiana Gross Income Tax [ ] upon [Constitutional] terms, as has been done almost invariably in the past, is like the lure of the siren's song....

Insofar as here pertinent, the Gross Income Tax statute requires that in order to be taxable, gross income of a non-resident must be derived from activities within the state. If the activities giving rise to the income sought to be taxed do

not occur within Indiana, then the tax may not be levied—not because to do so is forbidden by the United States Constitution (although it may well be)—but rather because under those facts the levy is forbidden by the statute.

*Indiana Dep't of State Revenue v. Convenient Indus. of Am., Inc.* (1973), 157 Ind. App. 179, 181–85, 299 N.E.2d 641, 643–45; *accord Miami Coal Co. v. Fox* (1931), 203 Ind. 99, 116, 176 N.E. 11, 17.

"Courts will not decide Constitutional questions unless such a determination is necessary." *Indiana Dep't of State Revenue v. J.C. Penney Co.* (1980), Ind.App., 412 N.E.2d 1246, 1252 (citing *Indiana Educ. Employment Relations Bd. v. Benton Community School Corp.* (1977), 266 Ind. 491, 365 N.E.2d 752), *trans. denied; Bayh v. Sonnenburg* (1991), Ind., 573 N.E.2d 398, 402. Therefore, the court must analyze, in the order specified above, the requirements that permit the imposition of tax under the Indiana Gross Income Tax Act (the Act), IND.CODE 6–2.1–1–1 *et seq.*

The first issue is whether Bethlehem's cash proceeds received from safe harbor lease transactions constitute "gross income" within the meaning of the Act. Indiana imposes tax on a taxpayer's receipt of "gross income." IC 6–2.1–2–2(a). The Act specifically defines "gross income":

(a) Except as specifically provided in this article, *'gross income' means all the gross receipts a taxpayer receives:*

(1) from trades, businesses, or commerce;

(2) as admission fees or charges;

(3) *from the sale, transfer, or exchange of property, real or personal, tangible or intangible;*

(4) from the performance of contracts;

(5) as prizes or premiums;

(6) from insurance policies;

(7) as damages or judgments;

(8) from the investment of capital, including interest, discounts, rentals, royalties, dividends, fees, and commissions;

(9) from the surrender, sale, transfer, exchange, redemption of, or distribution upon, stock of corporations or associations; and

(10) *from any other source not specifically described in this subsection.*

(b) Except as provided in IC 6–2.1–4, *no deductions from a taxpayer's gross income may be taken for return of capital invested,* cost of property sold, cost of materials used, labor costs, interest, discounts, commissions paid or credited, losses, or any other expense paid or credited.

. . . .

IND.CODE 1981 6–2.1–1–2 (emphasis added).[4]

The court of appeals explained that the legislature used the term "gross income" in the Act in its ordinary, all-inclusive, broad, and comprehensive meaning as "all that which comes in." *Storen v. Jasper County Farm Bureau Co-op. Ass'n* (1936), 103 Ind.App. 77, 81, 2 N.E.2d 432, 433. Our supreme court further described the nature and scope of Indiana's gross income tax as

a tax on total receipts without deductions of any sort. . . . The purpose of the Gross Income Tax was to levy a tax upon the receipts of *all sums coming into the hands of the taxpayer,* without regard as to whether or not he may have suffered an actual loss in the transaction.

*Department of Treasury v. Crowder* (1938), 214 Ind. 252, 256, 15 N.E.2d 89, 91–92 (emphasis added).

■ Unless a transaction comes clearly within one of the provisions of the definition under IC 6–2.1–1–2, it cannot be taxed as "gross income." *Department of Treasury v. Muessel* (1941), 218 Ind. 250, 254, 32 N.E.2d 596, 597; *Department of State Revenue v. Crown Dev. Co.* (1952), 231 Ind. 449, 455, 109 N.E.2d 426, 428; *Indiana Dep't of State Revenue v. Klink* (1953), 232 Ind. 473, 477, 112 N.E.2d 581, 582; *Indiana Dep't of State Revenue v. Kroger*

*Co.* (1983), Ind.App., 453 N.E.2d 1175, 1177 (quoting *Walgreen Co. v. Gross Income Tax Div.* (1947), 225 Ind. 418, 420, 75 N.E.2d 784, 785). To determine whether Bethlehem's cash proceeds fall clearly within one of the provisions of the statutory definition of "gross income," the court must first determine the nature of the receipts.

■ For federal income tax purposes, safe harbor lease provisions recognize the nature of the receipts according to their *form,* as sale-leasebacks, not their substance. Indiana, however, is not bound to imitate the federal tax treatment of safe harbor lease transactions. The federal tax code does not require the states to provide identical tax consequences, and Indiana's gross income tax law does not generally incorporate the federal tax code or specifically incorporate I.R.C. § 168(f)(8).[5] Indeed, Indiana's tax laws do not specifically address the tax consequences of transactions structured pursuant to § 168(f)(8).

■ In Indiana, tax consequences generally are determined by the substance rather than the form of a transaction. *Monarch Beverage Co. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 589 N.E.2d 1209, 1215; *accord Union Sec., Inc. v. Merchants' Trust & Sav. Co.* (1933), 205 Ind. 127, 135, 185 N.E. 150, 152; *Gross Income Tax Div. v. Warner Bros. Pictures Distrib. Corp.* (1954), 233 Ind. 345, 361, 118 N.E.2d 117, 125 (Bobbitt, J. dissenting) (citing *Browning v. City of Waycross* (1914), 233 U.S. 16, 34 S.Ct. 578, 58 L.Ed. 828, *cert. denied,* (1954), 348 U.S. 857, 75 S.Ct. 82, 99 L.Ed. 675; *Commissioner of Internal Revenue v. Court Holding Co.* (1945), 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; *Ingram–Richardson Mfg. Co. v. Gross Income Tax Div.* (1954), 233 Ind. 109, 117 N.E.2d 272); *Thompson v. Arnold* (1958), 238 Ind. 177, 181, 147 N.E.2d 903, 907–08; *Department of Treasury v. Jackson* (1941), 110 Ind.

4. Public Law No. 77 restated in a codification the state's gross income tax law, amending IND. CODE 6 by adding IND.CODE 6–2.1 and repealing IND.CODE (1971) 6–2–1 *et seq.* P.L. 77–1981 §§ 1, 22, 23.

5. Some state's income tax laws are specifically tied to the federal income tax law. *E.g.,* MD. TAX–GENERAL ANN.CODE §§ 10–304 to 10–308 (1988) (amended 1991); MD.TAX–GENERAL ANN.CODE § 10–107 (1988).

App. 36, 46, 37 N.E.2d 31, 35; *Madding v. Indiana Dep't of State Revenue* (1971), 149 Ind.App. 74, 83–4, 270 N.E.2d 771, 776; *Reynolds Metals Co. v. Indiana Dep't of State Revenue* (1982), Ind.App., 433 N.E.2d 1, 17 (citing *Wayne Pump Co. v. Department of Treasury* (1953), 232 Ind. 147, 110 N.E.2d 284; *Meridian Mortgage Co. v. State* (1979), 182 Ind.App. 328, 341, 395 N.E.2d 433, 440–41); *Mason Metals Co. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 590 N.E.2d 672, 675. Therefore, Indiana must tax safe harbor lease transactions according to their economic realities, the substance of the transactions, looking beyond the legal fiction of the sale-leaseback. To determine the substance of a transaction, the court must consider all of the surrounding facts and the legal effect of the transaction. *Thompson,* 238 Ind. at 186, 147 N.E.2d at 907–08; *see also Union Sec.,* 205 Ind. at 135, 185 N.E. at 152; *Jackson,* 110 Ind.App. at 43, 37 N.E.2d at 35.

Bethlehem asserts the substance of safe harbor lease transactions, considering all the surrounding facts, is to return a portion of the purchase price of the underlying equipment. Under the statutory definition of "gross income" a return of a portion of a purchase price could be either a cash discount or a return of capital invested. The distinction is critical because "cash discounts allowed and taken on sales" are expressly *excluded* from "gross income" under IC 6–2.1–1–2(c)(11), but a "return of capital invested" is expressly *included* in "gross income" under IC 6–2.1–1–2(b).

Well-settled rules of statutory construction designed as aids to determine the legislative intent underlying a statute require that

> statutes that apply to the same subject matter must be construed harmoniously, *Marion County Sheriff's Merit Bd. v. Peoples Broadcasting Corp.* (1989), Ind., 547 N.E.2d 235, 237 (citing *Schrenker v. Clifford* (1979), 270 Ind. 525, 387 N.E.2d 59, 60; *Bell v. Bingham* (1985), Ind.App., 484 N.E.2d 624, 627), giving effect, if possible, to every word and clause. *Guinn v. Light* (1990), Ind., 558 N.E.2d 821, 823 (citing *Doughty v. State Dep't*

*of Pub. Welfare* (1954), 233 Ind. 213, 117 N.E.2d 651).

*Caylor–Nickel Clinic,* 569 N.E.2d at 768. A construction of the cash discount exclusion that would include *all* transactions that return a portion of a purchase price is not in harmony with IC 6–2.1–1–2(b) because all returns of capital invested then would be deemed cash discounts, and IC 6–2.1–1–2(b), having no effect, would be rendered meaningless. The court "must assume that the legislature intended to adopt a meaningful statute and not an absurdity." *Indiana Dep't of State Revenue v. Frank Purcell Walnut Lumber Co.* (1972), 152 Ind.App. 122, 129, 282 N.E.2d 336, 341 (citing *In re Adoption of Jackson v. Barnhill* (1972), 257 Ind. 588, 277 N.E.2d 162).

Bethlehem claims the cash proceeds received from safe harbor lease transactions represent a non-taxable cash discount. The two leading cases construing the cash discount exclusion are *Indiana Department of State Revenue v. Marsh Supermarkets, Inc.* (1980), Ind.App., 412 N.E.2d 261 and *Indiana Department of State Revenue v. Kroger Co.* (1983), Ind.App., 453 N.E.2d 1175. In *Marsh* and *Kroger,* the court of appeals found transactions involving trading stamps and discount coupons are nontaxable cash discounts. The transactions at issue in both cases occurred within the context of consumer purchases and sales. Neither case includes anything to suggest, however, that the cash discount exclusion applies to transactions within the context of capital investments. *See also* 45 I.A.C. 1–1–33. Therefore, the decisions in both *Marsh* and *Kroger* and the intent of the legislature underlying the statutory cash discount exclusion from "gross income" limit its scope to the context of non-capital transactions. Accordingly, the court finds the nature of Bethlehem's cash proceeds is not a cash discount under IC 6–2.1–1–2(c)(11) because Bethlehem's purchase of equipment pursuant to the federal safe harbor lease provisions was a capital investment in depreciable equipment, not a consumer purchase.

Some other jurisdictions view the substance of safe harbor lease transactions as

a return of a portion of purchase price in which the nature of the receipts represent a return of capital. Judge Byers of the Oregon Tax Court determined, for purposes of Oregon taxation, that receipts from safe harbor lease transactions constituted the return of capital invested in equipment (recovery of basis), rather than the sale of tax benefits. *Portland Gen. Elec. Co. v. Dep't of Revenue* (1988), 11 Or.Tax 78, 88; *accord* Legal Ruling 419 (Cal.Fran.Tax.Bd. December 3, 1981), 1981 WL 11909, Cal.St.Tax.Rep. (CCH) ¶ 10–577.-20. Jurisdictions that permit a deduction for the recovery of basis, unlike Indiana, tax net income rather than gross income. Therefore, jurisdictions that tax net income do not tax the return of capital invested but do tax the proceeds of the sale of an intangible. In Indiana, however, the distinction is without a difference because "gross income" expressly includes *both* the receipts from a sale of an intangible under IC 6–2.1–1–2(a)(3) and the return of capital invested under IC 6–2.1–1–2(b).

▮ The Department asserts the substance of Bethlehem's transactions is the sale of intangible federal tax benefits, the cash proceeds from which are expressly included as "gross income" under IC 6–2.1–1–2(a)(3). Indeed, this court and the supreme court both described the nature of receipts derived from safe harbor lease transactions as the sale of intangible federal tax benefits. *Hoosier Energy Rural Elec. Coop., Inc. v. Indiana Dep't of State Revenue* (1988), Ind.Tax, 528 N.E.2d 867, 874, *aff'd*, (1991), Ind., 572 N.E.2d 481, 485, *cert. denied*, (1991), —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277. The court therefore finds Bethlehem's cash proceeds received from safe harbor lease transactions are, in substance, receipts from the sale of intangible federal income tax benefits clearly within the meaning of "gross income" under IC 6–2.1–1–2(a)(3).

## II.

▮ Bethlehem contends the gross income it received from safe harbor lease transactions is not subject to gross income tax because it was not derived from an Indiana source. As a non-resident taxpayer, Bethlehem is not taxed on its entire gross income, but only on that portion of its gross income that is derived from "sources within Indiana." IC 6–2.1–2–2(a)(2). Despite its importance as a taxable event, the phrase "sources within Indiana" is not defined in the Act. *See Gross Income Tax Div. v. P.F. Goodrich Corp.* (1973), 260 Ind. 41, 44–45, 292 N.E.2d 247, 249 (citing Burns § 64–2601 [currently IC 6–2.1–1]; *Mueller Brass Co. v. Gross Income Tax Div.* (1971), 255 Ind. 514, 265 N.E.2d 704; *Miles v. Department of Treasury* (1935), 209 Ind. 172, 199 N.E. 372).

Judicial construction of "source" as the incident of taxation has grown-up around the concept of "business situs." Over half a century ago and prior to the enactment of the Gross Income Tax Act, our supreme court recognized the principle underlying the legislature's enactment of public revenue laws is to permit taxation only when the property that is the basis of the tax is within the jurisdiction of this state. *Miami Coal*, 203 Ind. at 115, 176 N.E. at 17. The rules for determining whether a property is within a state's taxing jurisdiction, however, have undergone considerable change. In *Miami Coal*, our supreme court explained the evolution of the concept of "business situs" for determining the taxability of personal property. "The common-law rule ... is that personal property follows the person of the owner and has its situs at his domicile." *Miami Coal*, at 111, 176 N.E. at 15–16; *see also Foresman v. Byrns* (1879), 68 Ind. 247.

[T]he common-law rule [is based on the ancient maxim *mobilia sequuntur personum* and] became the law from custom in the Middle Ages. This rule which concerns personal property had quite a universal judicial following both in England and the United States until through the progress of civilization personal property became much more varied in both use and legal contemplation until, as stated by Justice Gray: 'In modern times, since the great increase of amount and variety of personal property, not immediately connected with the person of the owner, that rule has yielded more

and more to *lex situs*, the law of the place where the property is kept and used.'

*Miami Coal*, 203 Ind. at 109–10, 176 N.E. at 15 (quoting *Pullman's Palace Car Co. v. Pennsylvania* (1891), 141 U.S. 18, 22, 11 S.Ct. 876, 878, 35 L.Ed. 613, 616).

"There has been an analogous development in connection with intangible property by reason of ... the conduct by an owner of his business in a state different from that of his domicile." *Wheeling Steel Corp. v. Fox* (1936), 298 U.S. 193, 210, 56 S.Ct. 773, 777, 80 L.Ed. 1143, 1148.

Indiana courts have long recognized the situs of an intangible may be different than the domicile of the taxpayer. *Buck v. Miller* (1896), 147 Ind. 586, 589, 45 N.E. 647, 648; *Miami Coal*, 203 Ind. at 113, 176 N.E. at 16. "The legal proposition that personal property may obtain an actual situs different from the domicile of its owner [is] designated by the words 'business situs....'" *Miami Coal*, at 107, 176 N.E. at 14 (citing *City of New Albany v. Meekin* (1852), 3 Ind. 481, 56 Am.Dec. 522; *Herron v. Keeran* (1877), 59 Ind. 472, 26 Am.Rep. 87; *Standard Oil Co. v. Bachelor* (1883), 89 Ind. 1; *Eversole v. Cook* (1883), 92 Ind. 222; *Senour v. Ruth* (1895), 140 Ind. 318, 39 N.E. 946; *Buck v. Miller*, 147 Ind. 586, 45 N.E. 647; *Hathaway v. Edwards* (1908), 42 Ind.App. 22, 85 N.E. 28). Determining the "business situs" of intangible personal property sufficient to uphold a tax upon it presents difficulties inherent in the nature of intangibles, which often have no physical manifestation and therefore no situs in the physical sense. *See Wheeling Steel*, 298 U.S. at 209, 56 S.Ct. at 776, 80 L.Ed. at 1147.

For purposes of property taxation, our supreme court determined in *Miami Coal* that an Indiana corporation's intangible bills and accounts receivable were not subject to Indiana tax because all the sales activities that generated the intangibles were conducted in Illinois. *Miami Coal*, 203 Ind. at 113, 176 N.E. at 16. The court's analysis focused on the relationship between the intangible and the activities at the "business situs". *Id.* at 109, 176 N.E.

at 15. In other words, the court found the mining and shipping of coal conducted at the company's Indiana domicile were insufficient activities to support the imposition of Indiana tax on intangibles that were generated by activities at the taxpayer's Illinois "business situs." The court stated, "a taxing unit in Indiana may not reach into a business situs in Illinois and grasp the intangible thing which is so affixed to a business that it is a part and parcel of it." *Id.* at 113, 176 N.E. at 16. Miami Coal's bills and accounts receivable therefore had a "business situs" in Illinois not Indiana.

## REGULATIONS

The *Miami Coal* analysis remains vital within the context of the gross income tax. The Department, interpreting the gross income tax statute, provides two tests to determine the taxability of income from an intangible, the "business situs" test and the "commercial domicile" test. 45 I.A.C. 1-1-51; *see also Hoosier Energy*, 528 N.E.2d at 872. "A rule issued by an agency pursuant to its statutory authority to implement the statute has the force of law." *Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 586 (citing *Hoosier Energy*, 528 N.E.2d at 873), *aff'd sub nom.*, (1992), Ind., 585 N.E.2d 1336.

 According to the "business situs" test, the total gross income derived from the sale of an intangible is subject to Indiana's gross income tax if (1) the taxpayer has a "business situs" in Indiana and (2) the intangible or the income therefrom is connected with the business at the Indiana situs, *i.e.*, "the intangible or the income derived therefrom forms an integral part of a business regularly conducted at a situs in Indiana...." 45 I.A.C. 1-1-51. "A taxpayer may have many business situses," *id.*, at which activities connected with an intangible could occur. Consequently, the dispositive analysis for imposing tax under the "business situs" test focuses, as the supreme court did in *Miami Coal*, on the relationship between the intangible and the "business situs." A con-

clusion that an intangible is integrally connected with a taxpayer's "business situs" determines what may be termed the *intangible's "business situs"* or the "tax situs" or "source" of the intangible.

The second test to determine the taxability of an intangible is the "commercial domicile" test. "A taxpayer ... has only one commercial domicile," which is determined, based on all the facts, as "the location of the majority of all the taxpayer's activities or business.... the 'nerve center' or 'corporate center' of all the business functions of the taxpayer." *Id.* The concept of "commercial domicile" recognizes that multistate corporations control operations at their plants in diverse locations from one centralized government. *See Wheeling Steel*, 298 U.S. at 211–12, 56 S.Ct. at 778, 80 L.Ed. at 1149.

■ The inquiry under the "commercial domicile" test is (1) to determine the taxpayer's "commercial domicile," (2) "[i]f a taxpayer's commercial domicile is in Indiana, *all* of the income from intangibles will be taxed ... *except* that income which may be directly related to an integral part of a business regularly conducted at a 'business situs' outside Indiana[,]" and (3) if a taxpayer's "commercial domicile" is outside Indiana, *"no* income from intangibles will be taxed ... *unless* the taxpayer has also established a business situs in Indiana and the intangible income derived therefrom forms an integral part of that Indiana activity." 45 I.A.C. 1–1–51 (emphasis added).

Generally, a taxpayer will have a "business situs," as defined in 45 I.A.C. 1–1–49, at the place of his "commercial domicile," the site of business vital to the entirety of the taxpayer's business. After determining a taxpayer's "commercial domicile," however, the focus, as in the "business situs" test, is on the relationship between the intangible and a "business situs" of the taxpayer, *i.e.*, the "business situs" of the intangible.

In the case at bar, Bethlehem has a "business situs" in Indiana at its steel-making facility at the Burns Harbor Plant and theoretically, in all the remaining for-

ty-nine states and the District of Columbia because it is authorized to do business in all. The parties stipulated that Bethlehem's "commercial domicile" is in Pennsylvania. Therefore, under either the "business situs" test or the "commercial domicile" test under 45 I.A.C. 1–1–51, the definitive analysis is the same: the income from Bethlehem's sale of intangible tax benefits is taxable only if the intangible or the income therefrom forms an integral part of Bethlehem's business activities conducted at the Burns Harbor Plant.

Whether Bethlehem's intangible tax benefits form an integral part of Bethlehem's business activities at the Burns Harbor Plant depends on the meaning of the word "integral." The word "integral" taken in its plain, ordinary, and usual sense is described as "of, relating to, or serving to form a whole: essential to completeness: organically joined or linked: CONSTITUENT, INHERENT...." *WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY* 1173 (1981). Furthermore, Indiana courts define the term "integral" within the context of Indiana's sales tax law similarly, as necessary and essential. *See Indiana Dep't of State Revenue v. Cave Stone, Inc.* (1983), Ind., 457 N.E.2d 520, 522–25. Applying these definitions, the court is unpersuaded that the sale of intangible tax benefits is "necessary and essential" to Bethlehem's regularly conducted business activities in Indiana, the manufacture and sale of steel. The decision to sell Bethlehem's tax benefits was not made at the Indiana plant, the day-to-day operations of the plant were unaffected by the sale, and the regularly conducted business at the plant continued irrespective of the sales of federal tax benefits.

The Department's regulation interprets the imposition statute, for which a judicially created body of law exists.

If a regulation conflicts with a case law interpretation, little weight is afforded the regulation. *United States v. U.S. Steel, Corp.* (7th Cir.1973), 482 F.2d 439, 448, *cert. denied*, 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147. Additionally, an administrative interpretation that is in-

correct is entitled to no weight. *Lake County Beverage Co. v. 21st Amendment, Inc.* (1982), Ind.App., 441 N.E.2d 1008, 1014 (citing *Beer Distrib. of Indiana v. ABC* (1982), Ind.App., 431 N.E.2d 836).

*Johnson County,* 568 N.E.2d at 586.

Therefore, to have force, the Department's regulation must be consistent with the relevant case law. Consequently, the judicial interpretation of the language of IC 6–2.1–2–2(a)(2), in effect, injects the Department's term "integral" with meaning.

### CASE LAW

The Indiana Court of Appeals addressed the imposition of tax under IC 6–2.1–2–2(a)(2) and its statutory predecessors on a non-resident taxpayer's income from an intangible in *Convenient,* 157 Ind.App. at 182, 184–86, 299 N.E.2d at 645 and in *J.C. Penney,* 412 N.E.2d at 1251–52. *Compare Indiana Dep't of State Revenue v. General Foods Corp.* (1981), Ind.App., 427 N.E.2d 665 (using the same analysis to determine whether tax may be imposed under the statute upon the income from tangible personal property of an out-of-state taxpayer). In both *J.C. Penney* and *Convenient,* Judge Sullivan noted that in cases of doubt concerning the imposition of tax, the gross income tax statute must be construed most strongly against the state and in favor of the taxpayer. *J.C. Penney,* 412 N.E.2d at 1251 (citing *Convenient,* 157 Ind. App. at 186, 299 N.E.2d at 645); *accord Klink,* 232 Ind. 473, 112 N.E.2d 581; *Gross Income Tax Div. v. Surface Combustion Corp.* (1953), 232 Ind. 100, 111 N.E.2d 50, *cert. denied,* 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353. Furthermore, to impose tax under IC 6–2.1–2–2(a)(2), "[t]he derivation of the income must be attributable to *activity* within the state as opposed to the *person* from whom the income is received." *Convenient,* 157 Ind.App. at 185, 299 N.E.2d at 645 (emphasis added) (citing *Oxnard v. Murphy* (1963), 19 A.D.2d 138, 241 N.Y.S.2d 333; *Arvey Corp. v. Fugate* (1954) 129 Colo. 595, 272 P.2d 652); *accord Frank Purcell Walnut Lumber,* 152 Ind. App. at 128–29, 282 N.E.2d at 340–41; *see*

*also General Foods,* 427 N.E.2d at 670; *Indiana Dep't of State Revenue v. Sohio Petroleum Co.* (1976), 170 Ind.App. 123, 130–31, 352 N.E.2d 95, 99–101, *overruled on other grounds, Indiana Dep't of State Revenue v. Harrison Steel Castings Co.* (1980), Ind.App., 402 N.E.2d 1276. Moreover, "the Department must show that the activities within the State giving rise to the income, viewed as a whole, are more than minimal." *General Foods,* at 669–70 (citing *J.C. Penney,* at 1246); *accord Convenient,* 157 Ind.App. at 185, 299 N.E.2d at 645. In addition, if the local activities with respect to the intangible are remote and incidental, they will fall far short of the degree of activity contemplated by the gross income tax Act. *J.C. Penney,* at 1251; *see also Convenient,* 157 Ind.App. at 188–89, 299 N.E.2d at 647. Indeed, a weighing of activities seems to permeate the analysis as shown in *J.C. Penney* when the court indicated the determination was the result of a comparison between the instate activities associated with the intangible and the interstate character of the transaction. *J.C. Penney,* at 1252.

Accordingly, the case law analysis focuses on the relationship between the intangible and the taxpayer's "business situs" by identifying activities related to the critical transaction, here, the sale of an intangible giving rise to income, and then determining whether the degree of activities related to the critical transaction is sufficient to uphold taxation in Indiana. *J.C. Penney,* at 1251–52; *Convenient,* 157 Ind.App. at 188–89, 299 N.E.2d at 647; *General Foods,* at 670; *accord Miami Coal,* 203 Ind. at 113, 176 N.E. at 16. When activities related to the critical transaction occur at more than one situs, the dispositive inquiry therefore asks what degree of activity was regularly conducted at the different locations, *i.e.,* are the activities more than minimal, not remote and incidental to the critical transaction. *See J.C. Penney,* at 1251–52; *Convenient,* 157 Ind.App. at 188–89, 299 N.E.2d at 647.

 In the case at bar, the activities surrounding Bethlehem's sale of intangible federal tax benefits are, in quantity, over-

whelmingly outside Indiana: the negotiations, the purchasers, the closings, the up-front payments, the financial and legal advice, and most significantly, the decisions to sell all occurred outside the state. The lone related activity within Indiana was the location of the underlying equipment at the Burns Harbor Plant. To find the Department properly imposed tax in this case would require the court to find that the location of the underlying property, by its nature or quality, was alone sufficient to uphold taxation. In comparison with the entirety of related activities, however, the physical location of the underlying equipment alone is as remote and incidental to the sale of the tax benefits as the mining and shipping of the coal was to the sale of coal (bills and accounts receivable) in *Miami Coal* and the sales of goods were to the charge accounts (service charges) in *J.C. Penney*. Indeed, the parties stipulated that the Burns Harbor Plant had nothing to do with the sale activities other than the use and storage of the underlying equipment, and yet the income Indiana seeks to tax did not depend on the use of the equipment in Indiana, the location of the equipment in the state, or any other activity in the state.

Accordingly, the word "integral" as used to determine the "business situs" of an intangible or the income therefrom under regulation 45 I.A.C. 1–1–51 takes its meaning from case law standards. The "integral" analysis therefore weighs the degree of related activity at a "business situs" to determine if it is more than minimal and not remote or incidental to the transaction giving rise to the income instead of analyzing whether the Indiana activities are "necessary" and "essential" to the transaction. Consequently, Bethlehem's intangible tax benefits do not have a "business situs" in Indiana because the tax benefits are not an integral part of the steel-making business conducted in Indiana, and the income at issue is not derived from "sources within Indiana" or an Indiana "tax situs" because the activities within Indiana related to Bethlehem's sale of tax benefits fall far short of the degree of activity contemplated by our gross income tax statute.

The court therefore finds the source, under IC 6–2.1–2–2(a)(2), or in other words, the "business situs" that is the incident of taxation under 45 I.A.C. 1–1–51, of the income from Bethlehem's sale of intangible tax benefits is outside Indiana and not subject to Indiana's gross income tax.

### HOOSIER ENERGY

The Department claims the decisions by the tax court and the supreme court in *Hoosier Energy* are dispositive, favoring the imposition of tax in the case at bar, because they stand for the proposition that the "business situs" of intangible tax benefits sold pursuant to I.R.C. § 168(f)(8) is the location of the underlying property. Deciding the source of income, or "business situs," for purposes of state taxation, however, is fact sensitive, requiring a case by case determination. *Cf. Indiana Dep't of State Revenue v. Brown Boveri Corp.* (1982), Ind., 439 N.E.2d 561, 564 (citing *Indiana Dep't of State Revenue v. Hoosier Metal Fabricators* (1978), 177 Ind.App. 372, 379 N.E.2d 551) (case by case determination whether activities are local or interstate under Constitutional standards).

Unlike the instant case, the taxpayer in *Hoosier Energy* was an Indiana resident subject to tax on its entire gross income under IC 6–2.1–2–2(a)(1). Comparing the case at bar with the decisions in *Hoosier Energy* reveals not only that different analyses are required under the different imposition statutes implicated, one first requiring a state statutory analysis while the other does not, but also that significant factual distinctions exist. All the activities related to the sale of tax benefits in *Hoosier Energy* took place outside Indiana except that (1) Hoosier Energy's "commercial domicile" was in Indiana, *Hoosier Energy*, 528 N.E.2d at 872; *Hoosier Energy*, 572 N.E.2d at 485, and (2) the equipment that generated the tax benefits was in Indiana. *Hoosier Energy*, 528 N.E.2d at 868; *Hoosier Energy*, 572 N.E.2d at 482.

The judicial determination regarding the location of Hoosier Energy's "commercial domicile" indicates, in the absence of contrary facts, the location of the ultimate

control and decision-making for the multistate corporation as a whole. *See* 45 I.A.C. 1–1–51; *Wheeling Steel*, 298 U.S. at 211–12, 56 S.Ct. at 778, 80 L.Ed. at 1149. Indeed, the supreme court stated that both "Hoosier *and its property* have both its business situs and commercial situs within the State of Indiana." *Hoosier Energy*, 572 N.E.2d at 485 (emphasis added).

The location of the equipment underlying Hoosier Energy's tax benefits is significant because "[t]he intangible which was sold, federal income tax benefits, cannot exist separate and apart from the taxpayer and property which, with the aid of IRC § 168(f), created the intangible." *Hoosier Energy*, 572 N.E.2d at 485; *see also Hoosier Energy*, 528 N.E.2d at 872; *contra Wheeling Steel*, 298 U.S. at 212–14, 56 S.Ct. at 778–79, 80 L.Ed. at 1149–50 (accounts receivable generated from the sale of tangible personal property exist separate and apart from the underlying property, and are allocable to the seller's state of "commercial domicile" not the place where the underlying property was manufactured or sold). Nevertheless, "[t]he physical location of the intangible at the time any income is received under either the 'business situs' test or the 'commercial domicile' test is not a controlling factor but will be considered in view of all the facts presented." 45 I.A.C. 1–1–51. Accordingly, the location of the underlying property, although evidence of the "business situs" of an intangible, is not dispositive. Consequently, the factual basis upon which this court and the supreme court held that the "business situs" of Hoosier Energy's intangible tax benefits was Indiana and therefore subject to tax was *both* the location of the underlying property and the location of the ultimate control and decision-making concerning the transactions, *i.e.*, the intangible's "commercial domicile."

Denying the imposition of tax in this case is entirely consistent with the decision to uphold taxation in *Hoosier Energy*. First, different outcomes reflect the legislature's intent, evidenced by the separate imposition statutes with distinct requirements, to treat non-residents, for whom the concern about multiple taxation is greater, differently than residents.

Second, unlike Hoosier Energy, Bethlehem has only a single activity within Indiana that is related to the sale of its tax benefits, the location of the underlying equipment. To uphold the tax in this case based on reading *Hoosier Energy* as if it broadly held the "business situs" of an intangible is coincidental with the physical location of the underlying property, as the Department urges, would ignore the importance indicated by *Hoosier Energy* of the activities related to a taxpayer's "commercial domicile," would invalidate the portion of regulation 45 I.A.C. 1–1–51 that states physical location is not dispositive, and would abolish the requirement to consider the *degree* of activity sufficient to impose tax that is contemplated by the Indiana Gross Income Tax Act and articulated in *J.C. Penney*, at 1251–52, and *Convenient*, 157 Ind.App. at 188–89, 299 N.E.2d at 647.

Finally, if this court upheld the taxation of Bethlehem's intangible income, this case when read together with *Hoosier Energy* would create a bright line test that looks to a single fact, the location of the property underlying intangible tax benefits, to determine the taxability of an intangible in Indiana. Such a test therefore would be based on the legal fiction that the situs of intangible follows the underlying tangible property, similar to the legal fiction described by the maxim *mobilia sequuntur personum* and that was long ago discarded because its rigidity ignored the realities surrounding the different types of intangibles and the way they are held in modern times.

For all the above reasons, this court will neither adopt a single fact bright line test nor reach beyond its borders to grasp the intangible thing or the income therefrom that is so affixed to a "business situs" outside Indiana that it is part and parcel of it.[6]

---

6. It is beyond the bounds of this court to determine the "business situs" of Bethlehem's intangible tax credits once having determined the "business situs" is not in Indiana.

Although the court understands increased demand upon state funds inspires the search for new sources of revenue, the judiciary must only interpret and follow the law. The legislature is the appropriate branch of government to effect changes in the state's power to tax foreign taxpayers.

If, however, the State wishes to tighten its tax girdle upon activities conducted extraterritorily for the benefit of a foreign [taxpayer] but which have impact within the state, the legislature must in its wisdom wrestle with the economic, constitutional and policy considerations inherent in such a statutory alteration. *See* Johnson, Taxing Interstate Commerce, 39 Notre Dame Lawyer 557. Such changes, however, are not the prerogative of the judiciary.

*Convenient,* at 189, 299 N.E.2d at 647.

The court therefore finds Bethlehem's gross income from the sale of intangible federal tax benefits pursuant to I.R.C. § 168(f)(8) is not derived from "sources within Indiana" and is not subject to Indiana's gross income tax. Accordingly, the court DENIES the Department's motion for summary judgment and GRANTS Bethlehem Steel's motion for summary judgment. As a result of its decision, the court does not reach the questions of whether Bethlehem's gross income is "taxable gross income" under IC 6–2.1–1–13, is exempt under the interstate commerce exemption pursuant to IC 6–2.1–3–3, and is taxable without offending the Commerce Clause of the United States Constitution.[7]

---

7. The U.S. Constitution is the outer limit beyond which a state may not venture with its taxing power. A state may tax less than the Constitution permits. Because the court does not reach the Constitutional issues in the instant case, it does not address whether Indiana's laws are Constitutionally prohibitive.