INDIANA DEPARTMENT OF STATE REVENUE, Appellant (Respondent Below),

v.

BETHLEHEM STEEL CORPORATION, Appellee (Petitioner Below).

No. 49S05–9212–TA–1046.

Supreme Court of Indiana.

Aug. 19, 1994.

Rehearing Denied Nov. 23, 1994.

Pamela Carter, Atty. Gen., Joel Schiff, Deputy Atty. Gen., Indianapolis, for appellant.

Michael J. Rusnak, Glenn M. Sermersheim, Locke Reynolds Boyd & Weisell, Indianapolis, for appellee.

SHEPARD, Chief Justice.

Does the Indiana corporate gross income tax apply to receipts from the sale of federal tax benefits when the benefits derive from equipment located in Indiana but the owner is commercially domiciled in another state and the transaction occurs out of state? We hold it does not.

## I. Facts

Neither party disputes the facts. Bethlehem Steel Corporation is a multistate corporation which manufactures and sells iron and steel products. The corporation is incorporated in Delaware, commercially domiciled in Pennsylvania, and authorized to conduct business in all fifty states and the District of Columbia. Some fifteen percent of Bethlehem's business occurs at its Burns Harbor Plant in Porter County, Indiana.

In 1981, 1982, and 1983, Bethlehem sold its rights to certain federal tax benefits under I.R.C. § 168(f)(8) (repealed 1986).[1] Pursuant to § 168, Bethlehem structured these sales as sale-leaseback agreements or "safe harbor leases."[2] Each transaction followed the same pattern: Bethlehem purchased equipment eligible for federal tax deductions and credits (i.e., investment tax credits, energy tax credits, and accelerated depreciation deductions). Bethlehem then sold the equipment in exchange for cash and a nonrecourse note. The note equaled Bethlehem's basis in the equipment. The cash payment represented the purchase price for the tax benefits. The buyer then leased the equipment back to Bethlehem for an amount equal to the note payments. At the end of the lease, Bethlehem would repurchase the equipment at a nominal charge. Bethlehem always re-

---

1. Congress enacted § 168(f)(8) in 1981 to supplement existing tax incentives for business investment. Traditional deductions and credits provide incentives only to businesses with taxable income. Under § 168(f)(8), however, even companies without taxable income could benefit from qualifying investments because they could sell the tax benefits to companies having taxable income.

2. "The Lessor and the Lessee desire to obtain the benefits of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended. In connection therewith, the Lessor and the Lessee have agreed that for Tax Purposes ... the Lessee will assign to the Lessor the Tax Interest ... in each item of Equipment ... and the Lessee will lease the Tax Interest from the Lessor, all on the terms and subject to the conditions hereinafter set forth." Assignment and Lease Agreement of Dec. 29, 1982, between Deluxe Check Printers, Inc. and Bethlehem Steel Corporation, Ex. 7G at 1.

tained both possession of the equipment and title to it, and the only money actually to change hands was the proceeds from the sale of the benefits.

Approximately forty-five percent of the equipment underlying Bethlehem's safe harbor leases was located at Burns Harbor. The agreements were negotiated and consummated outside Indiana, however, through Bethlehem's New York investment advisers and legal counsel. All the buyers were non-Indiana companies, and the payments were made and received through bank accounts beyond our borders. Further, Bethlehem based its decisions to enter these agreements on financial and investment considerations, not on the business operations at the Burns Harbor Plant. The management at Burns Harbor did not play any role in these decisions, and the plant would have continued its operations whether or not these sales occurred.

In 1987, the Indiana Department of State Revenue audited Bethlehem's returns for the three years in question and assessed Bethlehem for the gross proceeds from the sales of tax benefits on the Indiana equipment. The gross proceeds amounted to $55,065,367, creating a $729,588 net tax liability.[3] Bethlehem protested. The Department conducted a hearing but upheld the additional taxes in May 1988. Bethlehem then paid the taxes and petitioned the Department for a $717,451 refund. The Department did not respond to the petition within 180 days, so Bethlehem filed an original tax appeal with the Indiana Tax Court. On cross motions for summary judgment, Judge Fisher reversed the Department's decision and held for Bethlehem. *Bethlehem Steel Corp. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 597 N.E.2d 1327. The Department timely petitioned this Court for review. Ind.Appellate Rule 18. We granted the Department's petition for

review and now affirm the Tax Court's judgment.

## II. Standard of Review

It is well established that any doubts regarding the meaning or applicability of the gross income tax statute will be resolved in favor of the taxpayer. *See, e.g., Gross Income Tax Div. v. Surface Combustion Corp.* (1953), 232 Ind. 100, 111 N.E.2d 50, *cert. denied*, 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353; *Indiana Dep't of State Revenue v. Convenient Indus. of Am.* (1973), 157 Ind.App. 179, 299 N.E.2d 641.

Moreover, we do not set aside the findings or judgment of the Tax Court unless they are clearly erroneous, Ind.Tax Court Rule 10, and summary judgments also enter the process of appellate review cloaked with a presumption of validity. As we explained in *Indiana Dep't of State Revenue v. Caylor-Nickel Clinic* (1992), Ind., 587 N.E.2d 1311, 1313:

> When [a] summary judgment involves a question of law within the particular purview of the Tax Court, cautious deference is appropriate. The Indiana Tax Court was established to develop and apply specialized expertise in the prompt, fair, and uniform resolution of state tax cases.

Thus, we accord due deference to the Tax Court's determinations of tax law on summary judgment and set aside such determinations only if we are definitely and firmly convinced that an error was made. *Cf. Associated Milk Producers, Inc. v. Indiana Dep't of State Revenue* (1989), Ind., 534 N.E.2d 715 (applying clearly erroneous standard to case tried on merits).

## III. Imposition Statute and Regulation

Indiana imposes a gross income tax on the gross receipts of residents and domiciliaries and on the gross receipts of nonresidents and nondomiciliaries.[4] Ind.Code Ann.

---

3. Bethlehem's actual tax liability was $956,043, but the corporation overpaid its 1979 income taxes and received a $226,455 credit. Restated Stipulation of Facts at 8.

4. While this case involves the gross income tax, Indiana also employs an adjusted gross income tax. In 1963, the Indiana legislature recognized that Indiana was losing revenue because the U.S.

Supreme Court had declared that Indiana's unapportioned gross income tax could not constitutionally reach proceeds from interstate commerce. *See Freeman v. Hewit*, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946) ("The tax on the sale itself cannot be differentiated from a direct unapportioned tax on gross receipts which has been definitely held beyond the State taxing pow-

art. 6–2.1 (Burns 1989). The taxability of the income of a nonresident or nondomiciliary depends upon three determinations.

First, the receipts must constitute "gross income." Ind.Code Ann. § 6–2.1–1–2 (Burns 1989). In *Hoosier Energy Rural Electric Coop. v. Indiana Dep't of State Revenue* (1991), Ind., 572 N.E.2d 481, we determined that the proceeds from sales of federal tax benefits under § 168(f)(8) are "gross income."

Second, the receipts must be "taxable gross income," which the statute defines as that portion of "gross income" not subject to exemption, Ind.Code Ann. ch. 6–2.2–3 (Burns 1989), or deduction, Ind.Code Ann. ch. 6–2.1–4 (Burns 1989). Ind.Code Ann. § 6–2.1–1–13 (Burns 1989). The provision relevant to this appeal exempts taxpayers with "[g]ross income derived from business conducted in commerce between the state of Indiana and either another state or a foreign country ... to the extent the state of Indiana is prohibited from taxing that gross income by the United States Constitution." Ind.Code Ann. § 6–2.1–3–3 (Burns 1989). This, of course, is less a tax exemption than a recognition that the Commerce Clause limits state taxing authority. U.S. Const. art. I, § 8, cl. 3.

Third, the imposition statute distinguishes between the income of residents and domiciliaries and the income of nonresidents and nondomiciliaries. The relevant provision reads:

(a) An income tax, known as the gross income tax, is imposed upon the receipt of:

(1) The entire taxable gross income of a taxpayer who is a resident or a domiciliary of Indiana; and

(2) The taxable gross income derived from activities or businesses or any other sources within Indiana by a taxpayer who is not a resident or a domiciliary of Indiana.

Ind.Code Ann. § 6–2.1–2–2(a). As a nondomiciliary, then, Bethlehem's gross receipts, including any proceeds from the sale of intangibles, are taxable only if they were "derived from activities or businesses or any other sources within Indiana." Two questions thus present themselves under the statute. First, were Bethlehem's cash proceeds from the sale of the tax benefits accruing to its Indiana equipment "derived from an activity or business or any other source within Indiana" for the purposes of § 6–2.1–2–2(a)(2)? Second, even if these proceeds were derived from an Indiana source, would a gross income tax on those proceeds violate the Commerce Clause of the United States Constitution and trigger the exemption specified by § 6–2.1–3–3?

### IV. *"Sources within Indiana"*

█ The statute does not define income "derived from activities or businesses or any other sources within Indiana." In the Tax Court, Judge Fisher read the imposition statute against the background of its interpreting regulation, the history of situs analysis, and judicial treatment of taxes on income from intangibles.[5] He explained:

[T]he case law analysis focuses on the relationship between the intangible and the taxpayer's "business situs" by identifying activities related to the critical transaction, here, the sale of an intangible giving rise to income, and then determining whether the degree of activities related to the criti-

er...."); *J.D. Adams Mfg. v. Storen*, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365 (1938) ("The vice of the statute as applied to receipts from interstate sales is that the tax includes in its measure, without apportionment, receipts derived from activities in interstate commerce...."). The legislature determined to reach interstate proceeds by enacting an apportioned adjusted gross income tax. Ind.Code Ann. art. 6–3 (Burns 1989). Presently, the gross income tax and the adjusted gross income tax form a single tax scheme, under which corporations are given a credit on their adjusted gross income tax liability for gross income taxes paid. Ind.Code Ann. § 6–3–3–2 (Burns 1989). For a

discussion of the history of these provisions, see Carlyn Johnson, *Taxing Interstate Commerce: A New Experience in Indiana*, 39 Notre Dame L.Rev. 557 (1963).

5. For additional applications of Fisher's interpretation, see *SFN Shareholders Grantor Trust v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 603 N.E.2d 194; *Indiana–Kentucky Electric v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 598 N.E.2d 647; *First National Leasing and Financial Corp. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 598 N.E.2d 640.

cal transaction is sufficient to uphold taxation in Indiana. When activities related to the critical transaction occur at more than one situs, the dispositive inquiry therefore asks what degree of activity was regularly conducted at the different locations, i.e., are the activities more than minimal, not remote and incidental to the critical transaction.

. . . .

The "integral" analysis [under the departmental regulation] therefore weighs the degree of related activity at a "business situs" to determine if it is more than minimal and not remote or incidental to the transaction giving rise to the income. . . .

*Bethlehem Steel*, 597 N.E.2d at 1336–37 (citations omitted). Employing this scheme, Judge Fisher analyzed the relationship between the transactions producing the gross income and Bethlehem's activities in Indiana and held that the sales of tax benefits were not sufficiently related to Bethlehem's business activities at Burns Harbor to support the Indiana tax. We generally approve Judge Fisher's reading and application of the statute.

**A. The Interpreting Regulation.** The Department's regulation, 45 I.A.C. 1–1–51, provides two tests for determining when intangible income derives from an Indiana activity, business, or source. First, the "business situs" test provides that if the taxpayer has established a business situs in Indiana, and "the intangible forms an integral part of a business regularly conducted at [that] situs," then the intangible has an Indiana situs for tax purposes. Second, the "commercial domicile" test holds that if the taxpayer has established its commercial domicile in Indiana, then "all of the income from intangibles will be taxed . . . except that income which may be directly related to an integral part of a business regularly conducted at a 'business situs' outside Indiana." If the tax-

payer has established its commercial domicile in another state, then "no income from intangibles will be taxed . . . unless the taxpayer has also established a business situs in Indiana and the intangible income derived therefrom forms an integral part of that Indiana activity." *Id.*

In the present case, the Department and Bethlehem agree that Bethlehem is commercially domiciled in Pennsylvania. The parties also agree that Bethlehem enjoys a business situs at its Burns Harbor Plant in Indiana. Thus, Indiana may not tax Bethlehem's income from the sales of the tax benefits unless the sales form an "integral" part of Bethlehem's in-state business activities.

While the regulation does not explain when an intangible or the income from an intangible forms an "integral part" of a business operation, the Department did not construct its situs approach from whole cloth. The analysis was derived from the property tax context,[6] and an understanding of this history provides insight into the meaning of this language.

■ **B. The History of Situs Analysis.** The long-established rule for taxing tangible property, *mobilia sequuntur personam*, held that such property followed the person of the owner. Under this rule, the owner's domicile had the sole authority to tax his personal property. A subsequent exception permitted the state in which the property was kept or used to levy a property tax. These were not competing rules, but a rule and its exception. The property still had only one situs for tax purposes, and only one state had the authority to tax.

In *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143 (1936), the Supreme Court applied this rule to intangibles, holding that due process demanded that intangibles be taxed only at the legal domicile of the owner.[7] This rule was subject to

6. The situs analysis for income from intangibles is not the only notion lifted from the property tax context and employed in the income tax arena. Early property tax cases also provide the basis for the current apportionment principles in state income tax schemes. Walter Hellerstein, *State Taxation of Interstate Business: Perspectives on Two Centuries of Constitutional Adjudication*, 41 Tax Lawyer 37, 47–48 n. 85 (1987).

7. "[Even] before the adoption of the fourteenth amendment, however, the Court had invalidated state taxes on the basis of natural law concepts of 'jurisdiction' and 'situs.'" Hellerstein, *supra* note 6, at 52 n. 115 (citation omitted).

an exception, however, where the intangible had acquired a situs at the owner's commercial domicile. The Court upheld the commercial domicile's ad valorem property tax on the accounts receivable and bank deposits of a corporation legally domiciled in another state. The Court affirmed the proposition that " 'choses in action may acquire a situs for taxation other than at the domicile of their owner, if they have become integral parts of some local business.' " *Id.* at 210, 56 S.Ct. at 777 (quoting *Farmers' Loan & Trust Co. v. Minnesota,* 280 U.S. 204, 50 S.Ct. 98, 74 L.Ed. 371 (1930)).

The Indiana Supreme Court had already recognized this doctrine in *Miami Coal Co. v. Fox* (1931), 203 Ind. 99, 176 N.E. 11, holding that Indiana could not levy a property tax on the accounts receivable of an Indiana corporation where those intangibles were an integral part of the business operations of an Illinois branch of the corporation. The taxpayer owned and operated coal mines in Indiana, with its management offices in Illinois. The Court observed that the Illinois office made the sales, accepted payment on the sales, set the prices, consummated the contracts, paid the Indiana employees, and ordered the shipments. Comparing the two operations, the Court held that the intangibles had their situs in Illinois, not Indiana:

> Inasmuch as the business of appellant at its office in Chicago has gained a business situs, the bills and accounts receivable are a part of and so intertwined with and affixed to the business of appellant at its foreign office, that a taxing unit in Indiana may not reach into a business situs in Illinois and grasp the intangible thing which is so affixed to a business that it is a part and parcel of it.

*Id.* at 112–13, 176 N.E. at 16.

Significantly, the Court in *Miami Coal* did not base its decision on the location of the account records or on the fiction that the accounts receivable had some physical location. The Court looked at all of the circumstances and activities surrounding the property in order to determine its tax situs. Similarly, the Department's modern regulation states: "The physical location of the intangible at the time any income is received under either the 'business situs' test or the 'commercial domicile' test is not a controlling factor but will be considered in view of all of the facts presented." 45 I.A.C. 1–1–51.

Of course, *Miami Coal* involved a property tax, and the Court of Appeals subsequently questioned whether it presented a valid approach for analyzing a gross income tax problem. In *Indiana Dep't of State Revenue v. Sohio Petroleum Co.* (1976), 170 Ind.App. 123, 352 N.E.2d 95, *overruled on other grounds, Indiana Dep't of State Revenue v. Harrison Steel Castings Co.* (1980), Ind.App., 402 N.E.2d 1276, the court held that Indiana could impose its gross income tax on dividends paid from one Indiana corporation to another even where the shares of stock were held out of state. The court issued its holding in spite of Department regulations prohibiting the taxation of shares of stock with legal situs outside Indiana and criticized the Department for "muddy[ing] the waters" by "engraft[ing] the *Miami Coal* business situs rule for personal property tax onto the gross income tax." *Id.* at 132, 352 N.E.2d at 100–01.

Certainly, the Department may not issue regulations inconsistent with the statute which it is administering, but the defect in the regulation at issue in *Sohio* was its reliance on the physical evidence of the intangibles to establish their tax situs.[8] This was not the mode of analysis in *Miami Coal.* Instead, the Court compared the Indiana and Illinois activities that contributed to the production of the accounts receivable and determined that the intangibles were too closely tied to the sale of coal in Illinois to permit the Indiana tax. Similarly, in the income tax context, we look to the whole of the income-producing transaction—the actors, activity,

---

8. Similarly, the court in *Indiana Creosoting Co. v. McNutt* (1936), 210 Ind. 656, 5 N.E.2d 310, distinguished *Miami Coal* in determining that Indiana could tax the gross income derived from the creosoting of railroad ties in Indiana by an Indiana corporation even where the contract for these services was negotiated and consummated out of state. As in *Sohio,* the concern in *Indiana Creosoting* was that the *Miami Coal* analysis would truncate the investigation of Indiana's role in the transaction.

and property—and weigh the in-state and out-of-state elements to determine if the intangible has an Indiana tax situs.

### ■ C. Judicial Treatment of Taxes on Income from Intangibles.

The Court of Appeals has employed this analysis in determining the taxability of the income from intangibles.[9] *See Indiana Dep't of State Revenue v. J.C. Penney Co.* (1980), Ind.App., 412 N.E.2d 1246; *Indiana Dep't of State Revenue v. Convenient Indus. of Am.* (1973), 157 Ind.App. 179, 299 N.E.2d 641. These precedents establish that whether a nondomiciliary's gross income from an intangible derives from an Indiana "source" depends on the relationship between Indiana and the actors, activities, and property creating the income. Indiana may not tax nondomiciliaries where the relation between Indiana and the subject of the tax is merely remote or incidental to the interstate transaction. *J.C. Penney*, 412 N.E.2d at 1248, 1252. The Indiana connection must be at least "more than minimal." *Convenient Indus.*, 157 Ind. App. at 185, 299 N.E.2d at 645.

In *Convenient Industries*, the Department attempted to tax an out-of-state corporation on the proceeds from the sale of food mart franchises in Indiana. Specifically, the Department wanted to tax the proceeds from the service and advertising fees received

from Indiana franchisees.[10] The Court of Appeals held for the corporation, concluding that the Indiana activities associated with the fees were minimal in comparison to the activities conducted out of state.

The court announced that "[t]he activities contemplated by the statute must be more than minimal," explaining that "[i]f it were otherwise, the statute itself would promote cumulative tax burdens upon interstate commerce contrary to the Constitution." *Convenient Indus.*, 157 Ind.App. at 185, 299 N.E.2d at 645. Applying this standard to the facts, the court compared the in-state and out-of-state activities that produced the proceeds. Regarding the service fees, the court found that supervisory inspections and an occasional report sent from Indiana to the main office in Kentucky were not sufficient to permit the tax. Regarding the advertising fee, the court found that the window banners and displays given to the Indiana franchisees represented only a fraction of the advertising fee. Again, the court held these connections insufficient for tax purposes.

Similarly, in *J.C. Penney*, the court dealt with a gross receipts tax on an out-of-state corporation. The Department attempted to tax an out-of-state corporation's gross proceeds from direct mail catalog sales and ser-

---

9. The language of the imposition statute for nonresidents and nondomiciliaries has remained substantially the same since 1933. *See* Burns Ind.Stat.Ann. § 64–2602 (1933) ("There is hereby imposed a tax, measured by the amount or volume of gross income, and in the amount to be determined by the application of rates on such gross income as hereinafter provided. Such tax shall be levied upon the entire gross income of all residents of the state of Indiana, and upon the gross income derived from sources within the state of Indiana, of all persons and/or companies, including banks, who are not residents of the state of Indiana, but are engaged in business in this state, or who derive gross income from sources within this state, and shall be in addition to all other taxes now or hereafter imposed with respect to particular occupations and/or activities...."); Burns Ind.Stat.Ann. § 64–2602 (as amended by 1937 Ind.Acts ch. 117, § 2) (Supp. 1943) ("Such tax shall be levied ... upon the receipt of gross income derived from activities or businesses or any other source within the state of Indiana, of all persons who are not residents...."); Burns Ind.Stat.Ann. § 64–2601

(1951 & Supp.1960); Burns Ind.Stat.Ann. § 64–2602 (1961); Burns Ind.Stat.Ann. § 6–2–1–2 (Supp.1974); Ind.Code Ann. § 6–2–1–2 (Burns 1978); Ind.Code Ann. § 6–2.1–2–2 (Burns Supp. 1983); Ind.Code Ann. § 6–2.1–2–2 (Burns 1989 & Supp.1993).

10. The Department attempted to tax the franchise fee itself, but the trial court held that the franchise fee itself was not taxable. The court explained:

> The franchise fee is income from the sale of an intangible. Plaintiff is a non-resident of the state of Indiana and such intangible does not have a situs in the state of Indiana, but rather has a situs in Louisville, Kentucky, the principal place from which the business of plaintiff was directed or managed.

*Convenient Indus.*, 157 Ind.App. at 183 n. 1, 299 N.E.2d at 644 n. 1. The Department did not contest this finding or holding on appeal. Instead, the Department contended only that Convenient owed taxes on the service and advertising fees.

vice charges on credit sales in Indiana.[11] The corporation owned and operated retail and warehouse facilities in Indiana and advertised extensively in the state. Despite these connections with Indiana, the court held that proceeds from the catalog sales and service charges were the product of interstate, not intrastate, commerce and were not derived from an Indiana "source." *J.C. Penney*, 412 N.E.2d at 1250, 1252.

For our purposes, the treatment of the intangible service charges is most important. The trial court in *J.C. Penney* had found that "the service charge income was income earned by a non-domiciliary corporation upon intangibles outside Indiana." *Id.* at 1251. As in *Convenient Industries,* the Court of Appeals compared the in-state and out-of-state elements of the income-producing transactions and noted that the out-of-state offices of the taxpayer kept the accounts and records, mailed account statements directly to the customers, collected payments directly from the customers, fielded inquires from customers, and collected on delinquent accounts. The court then stated: "On the basis of these facts, the trial court was justified in concluding that the local activities with respect to the credit service income were remote and incidental." *Id.*

*J.C. Penney* suggests continued vitality for situs analysis, even where a taxpayer enjoys a substantial Indiana presence. The decision in *Indiana Dep't of State Revenue v. General Foods Corp.* (1981), Ind.App., 427 N.E.2d 665, stands in accord. In *General Foods,* the court isolated the specific income-producing activities in determining whether the Department could tax the gross receipts from the sale of goods by an out-of-state corporation to Indiana customers. While the corporation operated a distribution and sales office in Indiana, the court found that the particular sales at issue were not closely enough related to these Indiana activities to constitute income derived from an Indiana source. The out-of-state offices made the sales, received the proceeds, solicited most of the orders (though some orders were solicited in Indiana by out-of-state representatives), accepted the orders, and shipped the goods from their out-of-state warehouses and factories. *Id.* at 666–67. The court concluded that the Indiana activities were "merely incidental to [the corporation's] total operation and were therefore insufficient for the Department to seize upon in attempting to apply I.C. § 6–2–1–2 [currently Ind.Code Ann. § 6–2.1–2–2(a)(2) ]." *Id.* at 670.

## V. Conclusion

Applying this analysis to the present case, we conclude that the proceeds from Bethlehem's sale of tax benefits were not "integrally related" to its business situs at Burns Harbor for the purposes of 45 I.A.C. 1–1–51. Although Indiana may tax the proceeds from sales of federal tax benefits where the taxpayer is incorporated and commercially domiciled in Indiana and the underlying property is located in Indiana, *Hoosier Energy* 572 N.E.2d 481, in the present case only the property was located in Indiana. Both the buyer and seller were non-Indiana corporations with non-Indiana commercial domiciles; the decisions to enter these agreements were made out of state, not by the Burns Harbor management; and the sales themselves were negotiated and completed out of state. We cannot say that the Tax Court erred when it weighed the in-state and out-of-state elements of the income-producing transactions and concluded that the degree activity connecting Indiana with the sales was insufficient to support the gross income tax.

We recognize that this approach to taxing income from intangibles may appear disadvantageous in a case like *Bethlehem Steel,* where Indiana has a some relation to income arising from the sale of intangibles by a nondomiciliary, but not a strong enough claim to defeat the domicile's right to tax the same proceeds. Under Indiana's situs analysis, when such a situation arises the domiciliary state retains the sole authority to tax. Since Indiana does not hesitate to claim the benefits of this scheme by taxing the entire proceeds from the sale of intangibles by an

---

11. J.C. Penney, of course, paid gross income tax on the amounts charged initially. At issue in the case was the taxability of the income from the service or interest charges on the charge accounts. *J.C. Penney,* 412 N.E.2d at 1251.

Indiana domiciliary despite the involvement of other states (as we did in *Hoosier Energy*, 572 N.E.2d at 486), Indiana must accept the costs of the scheme when its connection to the transaction is modest.

On the basis of the Department's regulation, the history behind that regulation, and the case law interpreting the imposition statute, we hold that the proceeds from Bethlehem's sale of tax benefits were not "derived from activities or businesses or any other sources within Indiana" for the purposes of § 6–2.1–2–2(a)(2). Because we decide the case on statutory grounds, we need not reach the Commerce Clause issue. Accordingly, we affirm the decision of the Indiana Tax Court.

GIVAN and DICKSON, JJ., concur.

DeBRULER, J., dissents with separate opinion.

SULLIVAN, J., dissents with separate opinion, in which DeBRULER, J., concurs.

DeBRULER, Justice, dissenting.

The analysis in the majority opinion leads me along another road. As pointed out, the intent of the Indiana taxing legislation here is to tax the proceeds received from nondomiciliaries and nonresidents from "activities or businesses or any other sources within Indiana...." Ind.Code § 6–2.1–2–2(a)(2) (West 1989). In *Gross Income Tax Division v. P.F. Goodrich Corp.* (1973), 260 Ind. 41, 292 N.E.2d 247, we recognized that the proceeds received by a corporation domiciled in Indiana from a sale of a one-sixth interest in a related Illinois corporation, a transaction occurring wholly in Illinois, were subject to Indiana gross income tax. An important part of that case was its recognition that Illinois also had a legitimate reason to impose a tax burden upon those proceeds, and that consistent with the Commerce Clause Indiana should apportion its tax. In the present case, Indiana is in the position that Illinois was in the *Goodrich* case, and some other state, perhaps Pennsylvania, is in the position that Indiana was in. The legislative provision that we construe today recognizes that Indiana, along with one or more other states, may impose some tax burden upon

the proceeds of a single transaction. Such several burdens must each be apportioned to the real connections which each state has with the transaction. Here, major Indiana government services were marshalled to preserve the equipment that was the subject of these lease transactions. I find that Indiana intends to tax the proceeds received by a nondomiciliary corporations in such a transaction and that Indiana may do so, so long as it fairly apportions its tax. *Hoosier Energy v. Dept. of State Revenue* (1991), Ind., 572 N.E.2d 481.

SULLIVAN, Justice, dissenting.

I respectfully dissent from the majority's opinion in this case.

I

Before analyzing the majority's reasoning, a few words are in order about the federal tax policies that gave rise to this case. An understanding of these policies is essential to appreciate what is really going on here—that the transactions that are at the heart of this case do not flow from a portfolio manager's decision to liquidate some intangible assets but are, rather, the direct result of a decision by manufacturing executives to make a significant investment in modernizing Bethlehem's steel production facilities in Indiana. Consequently, the gross income that decision generated is derived from an Indiana source.

In 1981, the United States Congress and the new President of the United States were faced with a recession. The manufacturing sector of the American economy, including the steel industry, was among the hardest hit by that recession. The manufacturing sector was so hard hit, in fact, that traditional tax incentives to modernize plant and equipment—investment tax credits and accelerated depreciation deductions—were of no value because these corporations were losing money. They had no net income and so no tax liability to be reduced by using the credits or deductions. *See* Senate Rept. No. 97–144 (July 6, 1981), 1981 U.S.C.C.A.N. 105, 166. Congress and the President recognized that for the country's manufacturing sector to regain its long-term health, investment in

new plant and equipment needed to be stimulated. To that end, the Economic Recovery and Tax Act of 1981 provided corporations that were losing money effectively the same tax incentives to modernize and to invest in new equipment that were available to profitable corporations. It did this by making it possible for any corporation that both invested in new equipment and placed that equipment in service to use a so-called "safe harbor lease"[1] to sell the tax credits and deductions related to that equipment to a profitable corporation that was in a position to use the credits and deductions to reduce its federal tax burden. *See* I.R.C. § 168(f)(8) (1981) (repealed 1986); House Conference Rept. No. 97–215 (Aug. 1, 1981), 1981 U.S.C.C.A.N. 285, 309.

Bethlehem, like most of the domestic steel industry at the time, was operating at a loss. In 1981, 1982, and 1983, the company took advantage of the new law. Bethlehem invested in and placed into service in Indiana new steel manufacturing equipment worth millions of dollars, and it then used the safe harbor lease provisions to "sell" the investment tax credits and accelerated cost recovery system (ACRS) deductions attributable to that Indiana equipment for approximately $55 million in gross income.

I need to spend another moment to emphasize the foregoing point. Bethlehem and the majority would have us believe that the sale-leaseback transactions really had little to do with Bethlehem's manufacturing business in Indiana. But that is just not so. The proceeds at issue here come from Bethlehem's sale of investment tax credits and ACRS deductions. To earn those investment tax credits, Bethlehem had to (1) *purchase* (2) *new* steel-making equipment and (3) *place it into service.* *See* I.R.C. § 168(f)(8)(D) (1981) (repealed 1986). In the leases, Bethlehem represented, warranted, and covenanted that the steel-making equipment it had purchased was *new* and had been *placed in service;* it also indemnified the lessor against any tax liability it might incur as a result of Bethlehem's breach of those representations,

warranties, and covenants. *See, e.g.,* Ex. 7G: Assignment and Lease Agreement No. 1, dated Dec. 29, 1982, §§ 10.01 and 10.02, between Deluxe Check Printers, Inc., as Lessor, and Bethlehem Steel Corporation, as Lessee.

Bethlehem's purchase of new steel-making equipment worth millions of dollars and its placement of that equipment into service (and its indemnification of its lessors against its failure to do so) had a close and integral relationship to Bethlehem's manufacturing business in Indiana.

Against this background, I think it is clear that the tax benefits Bethlehem sold are so inextricably connected with the company's Indiana-based equipment that the gross income Indiana seeks to tax absolutely depends upon *both* the use and the location of the equipment *in* Indiana. *Contra, Bethlehem Steel Corp. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 597 N.E.2d 1327, 1337. Bethlehem derived that income from activities, business, and sources within Indiana and that income is therefore subject to Indiana gross income tax.

## II

To decide this case it is necessary to resolve three legal issues: 1) whether the cash proceeds received by Bethlehem constituted gross income under the statute; 2) if those proceeds were gross income, whether Bethlehem derived that income from activities, business, or other sources within Indiana; and 3) if Bethlehem did derive that income from within Indiana, whether the Commerce Clause of the federal constitution permits taxation of the income by the state.

## A

Both the majority and the Tax Court agree, as do I, that the net proceeds constitute gross income under Indiana's gross income tax statute. Indeed, any conclusion to the contrary would be impossible without effectively overruling our opinion in *Hoosier Energy Rural Elec. Coop. v. Indiana Dep't of State Revenue.* (1991), Ind., 572 N.E.2d 481

---

[1]. "Safe harbor leases" were documented as either "financing leases" or "sale-leaseback" transactions. Bethlehem utilized the sale-lease-

back approach. *See* Brief in Support of Petitioner's Motion for Summary Judgment at 15–16 for a description of these alternatives.

(*Hoosier Energy II* ), aff'g (1988), Ind.Tax, 528 N.E.2d 867 (*Hoosier Energy I* ), cert. denied, —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991).

### B

I part company with the majority and the Tax Court, however, when they conclude that Bethlehem did not derive this gross income from activities, business, or other sources within Indiana. The majority and the Tax Court focus on the location of Bethlehem's corporate headquarters in Pittsburgh; but the very transactions that gave rise to these proceeds were Bethlehem's investments in new plant and equipment in Indiana and the placement of that equipment into service in Indiana—all for the purpose of modernizing Bethlehem's steel manufacturing facilities in Indiana.

I think this case requires nothing more than a simple, straightforward reading of the statute to find that the gross income Bethlehem earned when it sold investment tax credits and ACRS deductions for steel manufacturing equipment both located and placed into service in Indiana was, in fact, gross income "derived from activities or business or other sources in Indiana."

In contrast, the majority finds it necessary to search out the meaning of "derived from activities or business or other sources within Indiana," and it embarks on a wide-ranging examination of regulation and case law to try to find it. While I think such an examination totally unnecessary—from the plain language of the statute it is apparent that Bethlehem's income from the sale of its federal tax benefits is clearly taxable—I also think the majority misreads the regulations and cases as it goes.

The majority attempts to answer, in essence, but a single question in its analysis of the Department's regulation on the taxability of income from intangibles, in its discussion of the history of situs analysis, and in its recitation of Court of Appeals' decisions on the taxation of income from intangibles. That question is: whether the connection between Indiana and the activities, business, or other sources generating Bethlehem's

gross income was close enough to be called "integral"?

In view of the analysis above, I think the connection between Bethlehem's activities and the income those activities generated is clearly close enough to be characterized as "integral." Bethlehem decided to expand its Indiana steel manufacturing facility. The company bought new equipment and placed it into service in Indiana. It then sold off the investment tax credits and ACRS deductions attributable to that equipment located and placed into service in Indiana. It earned gross income from the sale of those tax benefits. Said differently, Bethlehem could not have earned the income at issue without purchasing new equipment and placing it into service. The law of investment tax credits and ACRS deductions required fulfillment of both conditions. Because Bethlehem decided to locate that new equipment in Indiana and to use it to produce steel in Indiana, the tax benefits themselves and the income generated by the sale of those benefits had an integral connection to Bethlehem's Indiana steel-making business.

1. *The Facts in the Gross Income Tax Cases Cited By the Majority Differ Greatly From the Facts in This Case and So Are Not Helpful.*

The integral connection between Bethlehem's activities and the income generated by those activities distinguishes this case from those cited by the majority. For example, in *Indiana Dep't of State Revenue v. J.C. Penney Co.* (1980), Ind.App., 412 N.E.2d 1246, 1248, the Court of Appeals decided that Penney's income from mail order sales to Indiana customers was not subject to Indiana adjusted gross income tax where (1) orders were mailed directly from Indiana customers to the catalog center in Wisconsin, (2) orders were accepted in Wisconsin, and (3) shipments were made from the catalog center in Wisconsin directly to the customer. In *Indiana Dep't of State Revenue v. Convenient Indus. of America* (1973), 157 Ind.App. 179, 188, 299 N.E.2d 641, 646, the Court of Appeals decided that Convenient Industries' franchise service and advertising fee income from Indiana franchisees was not subject to Indiana adjusted gross income tax where substantially all of the services that generat-

ed the fees were performed in Kentucky. In both *J.C. Penney* and *Convenient Industries,* the Court of Appeals concluded that the activities generating the income sought to be taxed did not occur in Indiana. *See Convenient Indus.,* 157 Ind.App. at 188, 299 N.E.2d at 645.[2] In contrast, it was the operation of Bethlehem's safe harbor lease equipment in Indiana that created the investment tax credits and ACRS deductions, the sale of which generated the gross income that the state seeks to tax in this case.

### 2. *The Regulation Relied upon by the Majority Indicates the Gross Income at Issue in this Case is Taxable.*

Under the heading "Sources within Indiana," the majority refers to Indiana Administrative Code title 45, Regulation 1–1–51 as "the interpreting regulation" and suggests that the regulation provides the controlling interpretation of when gross income is derived from "sources within Indiana." In fact, Regulation 1–1–51 of title 45 only purports to determine when income from intangibles is taxable and not whether income is derived from within Indiana. As I have already indicated above, one need not go beyond the unambiguous language of the gross income tax statute to see plainly that Bethlehem's gross income from the sale of federal tax benefits was derived from an activity, business, or other source within Indiana.

But in my view, a correct reading of Regulation 1–1–51 would reveal that the proceeds from Bethlehem's sale–leaseback transactions are taxable. The regulation provides two tests for the taxability of intangibles that

are really quite straightforward. First, if a taxpayer has established its commercial domicile in Indiana, then all income from intangibles is taxable in Indiana unless "the income is directly related to an integral part of a business regularly conducted at a "business situs" outside Indiana." Ind.Admin.Code tit. 45, r. 1–1–51 para. 6 (1992). Bethlehem has not established its commercial domicile in Indiana, so this test is not applicable to this case.

Second, if a taxpayer, regardless of whether its commercial domicile is in Indiana or not, has a "business situs" in Indiana, and "the intangible forms an integral part of a business regularly conducted at [that] situs," then the income from that intangible is taxable. Ind.Admin.Code tit. 45, r. 1–1–51 para. 2 (1992). I believe that Bethlehem's income from its sale of federal tax benefits meets this test for the taxability of income from intangibles.

The majority incorrectly states that by the terms of this test "Indiana may not tax Bethlehem's income from the sales of tax benefits unless the sales form 'an integral part' of Bethlehem's in-state business activities." In fact, the regulation provides that if either the intangible itself or the *sales proceeds* form an integral part of the business, the proceeds are subject to tax. Ind.Admin.Code tit. 45, r. 1–1–51 para. 2.

The majority also incorrectly states that "the regulation does not explain when an intangible or the income from an intangible forms an 'integral part' of a business operation."[3] In fact, the regulation clearly indi-

---

**2.** *Convenient Industries* and *J.C. Penney* might well be decided differently today. Although *Convenient Industries* was clearly decided on state statutory grounds and not on federal constitutional grounds, the Court of Appeals had constitutional concerns in mind when it said that the gross income tax statute had federal Commerce Clause "constitutional restrictions embraced within it." *Convenient Indus.* 157 Ind.App. at 185, 299 N.E.2d at 645. Four years later, the United States Supreme Court re-wrote prevailing Commerce Clause analysis of state tax regimes in *Complete Auto Transit v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Although *J.C. Penney* was decided after *Complete Auto Transit,* the Court of Appeals relied on the *Convenient Industries* analysis without recognizing the changes wrought by *Complete Auto Transit.* See

*J.C. Penney,* 412 N.E.2d at 1248. Whether this analysis would be used today in light of *Complete Auto Transit* and later cases is highly doubtful.

**3.** After asserting that the regulation does not explain what is meant by "integral part" of a business, the majority then engages in a long discussion of the case law relating to "business situs." I do not understand the relevance of "business situs"—the place in which a business is, for tax purposes, considered to conduct its activities—to defining "integral part of a business"—the connection of a particular intangible to the business conducted at that place. If the majority needs to know what "business situs" means for purposes of the gross income tax statute, it need only look to Regulation 1–1–49 of

cates that the "integral part" test is met if "the intangible or the income derived therefrom is connected with that business, either actually or constructively." Ind.Admin.Code tit. 45, r. 1–1–51 para. 3.

The intangible here, of course, is the tax benefits, and they were created by the use of the equipment to which they related in Bethlehem's Indiana steel-making business. I do not think that it can be seriously maintained that the generation of investment tax credits and ACRS deductions by the use of steelmaking equipment at Burns Harbor is not "connected" with Bethlehem's Burns Harbor business "either actively or constructively."

3. *How Other States Have Treated the Proceeds from Safe Harbor Lease Transactions Is Also Instructive and Further Supports the Conclusion That Bethlehem's Income Was Derived from an Integral Part of Bethlehem's Business in Indiana.*

Under the net income tax statutes of Wisconsin, Oregon, and California, taxpayers have sought to avoid the taxation of proceeds from safe harbor lease transactions. In each instance, the proceeds were treated as a return of capital that reduced the lessee's basis in the equipment it leased back. *See International Paper Co. v. Wisconsin Dep't of Revenue,* 1992 WL 104365 (Wis.Tax.App. Comm.1992); *Portland Gen. Elec. Co. v. Department of Revenue,* 11 Or.Tax 78, 1988 WL 95747 (Or.Tax 1988); Legal Rul. 419, 1981 WL 11909 (Cal.Fran.Tax Bd.1981). The analysis in each instance was that when the federal tax benefits were transferred, a portion of the owner's "bundle of rights" in the equipment passed to the buyer of those rights. "[T]he federal tax benefits were part and parcel of the equipment until they were

sold or until the equipment itself was sold, and the petitioner owned them by virtue of having acquired the equipment in the first place. The tax benefits were an integral part of the equipment in a property sense and would have been available to petitioner to reduce its own future federal tax liability, if any, had the sale at issue here not taken place." *International Paper,* 1992 WL 104365 at *6.[4]

4. *The Hoosier Energy Cases Dictate That the Gross Income at Issue in This Case is Taxable.*

Finally, while the majority and the Tax Court retreat from the holdings in *Hoosier Energy I* and *Hoosier Energy II,* it seems to me that the Tax Court was exactly right in *Hoosier Energy I* when it said that "the business situs of the intangible is in Indiana, since the tax benefits relate to personal property owned and operated by Hoosier in Indiana," 528 N.E.2d at 872, and went on to find that such aspects of the transaction as the "negotiations, closing, and transfer of funds" were of so little consequence that no apportionment of the proceeds to the state in which these "phantom obligations" took place was required. *Id.* at 873–74.

The majority concludes its opinion with the admonition that if Indiana wants to tax domiciliary Hoosier Energy, it must be willing not to tax non-domiciliary Bethlehem. But nothing in *Hoosier Energy I* or *Hoosier Energy II* depended upon Hoosier Energy being an Indiana-domiciled corporation. And even if it did, the broad sweep of the gross income tax statute makes such analysis unnecessary. In both cases, the income Indiana sought to tax absolutely depended upon both the location and the use of the equipment in Indiana. While the Tax Court decried this as a bright

---

title 45. In any event, I think it is beyond peradventure that Bethlehem has a business situs in Indiana.

4. Our Tax Court found below that in Bethlehem's case, the tax benefits were an intangible asset and that the proceeds from their sale was not a return of capital. See *Bethlehem Steel Corp. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 597 N.E.2d 1327, 1333. It observed that under our corporate gross income tax statute "the distinction [between an intangible asset and a re-

turn of capital] is without a difference because 'gross income' includes *both* the receipts from a sale of an intangible under IC 6–2.1–1–2(a)(3) and the return of capital invested under IC 6–2.1–1–2(b)." *Id.* But characterizing the payments for the tax benefits as intangible assets rather than as a return of capital, particularly when there is no difference for tax purposes, does not change the character of the payments as a integral part of Bethlehem's ownership rights in the equipment.

line test, I think taxpayers deserve—and in this case could easily have had—a bright line test.

In my view, we need look no further than the language of the statute to conclude that the proceeds from Bethlehem's safe harbor lease transactions constitute taxable gross income inasmuch as they are derived from Bethlehem's activities, business, or other sources within Indiana. But that aside, the majority's approach, correctly executed, would produce the same result. The tax benefits—the investment tax credits and accelerated depreciation deductions—were derived and, as a matter of federal tax law, could only have been derived from the operation of the equipment to which they related. That equipment was operated in Indiana. Since, as our sister States have held, the "tax benefits were an integral part of the equipment in a property sense," the source of the proceeds from the sale of those tax benefits must be the location of the equipment— Burns Harbor, Indiana.

### III

In *Hoosier Energy II* this Court discussed the constitutional limits on imposing gross income tax here.[5] The Commerce Clause permits a state tax that (i) is applied to an activity with a substantial nexus with the taxing state; (ii) is fairly apportioned, (iii) does not discriminate against interstate commerce, and (iv) is fairly related to the services provided by the state. *Goldberg v. Sweet,* 488 U.S. 252, 257, 109 S.Ct. 582, 586–87, 102 L.Ed.2d 607 (1989); *Complete Auto Transit v. Brady,* 430 U.S. 274, 287, 97 S.Ct. 1076, 1083, 51 L.Ed.2d 326 (1977); *Hoosier Energy II,* 572 N.E.2d at 484–485.

I have already discussed at length the nexus between Bethlehem's sale-leaseback transactions and this state. As regards fair apportionment, the U.S. Supreme Court employs two tests to ensure that each state taxes only its fair share of an interstate transaction. These tests determine whether

the tax is both internally and externally consistent. To be internally consistent, a tax must be structured so that if every state were to impose an identical tax, no multiple taxation would result. *Goldberg,* 488 U.S. at 261, 109 S.Ct. at 588–89. In Bethlehem's case, the internal consistency test is met because Indiana seeks to tax only the proceeds of the sale of tax benefits attributable to equipment in Indiana. *See Hoosier Energy II,* 572 N.E.2d at 485.

The external consistency test asks whether the state has taxed only that portion of the revenue from the interstate activity which reasonably reflects the in-state component of the activity being taxed. *Goldberg,* 488 U.S. at 262, 109 S.Ct. at 589. Because the tax applies only to the proceeds from Bethlehem's sale of tax benefits attributable to equipment in Indiana, the state is not seeking to tax any out-of-state component of the activity at all.

It could not be clearer that the tax involved here does not discriminate against interstate commerce. Indeed, our Court and the Tax Court have both held that this taxing scheme applies to precisely this transaction when engaged in by an Indiana taxpayer. *Hoosier Energy II,* 572 N.E.2d at 485; *Hoosier Energy I,* 528 N.E.2d at 872.

Lastly, I think it is beyond question that this tax is fairly related to the services provided Bethlehem by the state. Bethlehem's investment in hundreds of millions of dollars worth of additional steel-producing capacity in Indiana means that the taxpayers of this state have necessarily been called upon to provide infrastructure improvements, public safety and educational benefits, and other public services for Bethlehem, its employees, and their families.

### Conclusion

Congress provided an incentive for Bethlehem to modernize its steel production equipment. Bethlehem took advantage of that

5. There is something counter-intuitive about the analysis of both the majority and the Tax Court. One would expect that a legislature would attempt to extend its taxing authority over nonresident corporations as far as possible, limited only by the constitutional protections afforded interstate commerce. But here, where the constitutionality of the taxing scheme does not seem to be a problem, the majority holds that, in effect, the legislature did not intend to tax nonresident corporations to the full extent of its constitutional authority.

incentive when it purchased new equipment and placed it into service in Indiana. As a result of selling the investment tax credits and depreciation deductions on that Indiana equipment, Bethlehem earned gross income. The Indiana gross income tax applies to that gross income because the income was derived from activities, business, or other sources within Indiana. Additionally, under the federal decisions that are currently controlling of the issue, which decisions this Court must follow, the Commerce Clause poses no obstacle to the taxation of Bethlehem's gross income from the sale of federal tax benefits attributable to equipment located in Indiana. For these reasons, I dissent.

DeBRULER, J., concurs.